**Hilaria CANO, et al., Plaintiffs,**

v.

**EVEREST MINERALS CORP., et al., Defendants.**

**No. Civ.A.SA01–CA–610–XR.**

United States District Court,
W.D. Texas,
San Antonio Division.

March 28, 2005.

---

Mark A. Hovenkamp, John L. Grayson, Grayson Hovenkamp, Dennis C. Reich, Michael T. Howell, Reich & Binstock, Houston, TX, for Plaintiffs.

Ricardo G. Cedillo, Davis, Cedillo & Mendoza, San Antonio, TX, John R. Breihan, McGinnis, Lochridge & Kilgore, Austin, TX, Barry L. Wertz, McGinnis, Lochridge & Kilgore, Vineet Bhatia, Brian D. Melton, Susman Godfrey LLP, H. Ronald Welsh, Cunningham, Welsh, Darlow, Zook & Chapoton, LLP, Mary Lou Strange, Vinson & Elkins, LLP, Houston, TX, Jane F. Thorpe, David R. Venderbush, Scott A. Elder, Alston & Bird, L.L.P., Atlanta, GA, Frank Finn, Thompson & McKnight, Dallas, TX, Wallace M. Mays, Cima Energy Corporation, Greenwood Village, CO, for Defendants.

## ORDER

RODRIGUEZ, District Judge.

On this date, the Court considered Defendants' Motion to Exclude Expert Testimony of Dr. Malin Dollinger (docket no. 196), Plaintiffs' Response (docket no. 232), and Defendants' Reply (docket no. 250). In addition, the Court has reviewed voluminous additional material submitted by both sides, including but not limited to, Defendants' Memorandum of Science and

Law in Support of Motions to Exclude Expert Testimony (docket no. 198), both sides' responses to the questions posed by the Court at the December 2003 status conference (including two volumes of appendices filed by Plaintiffs), submissions filed after the *Daubert* hearings, and the various other motions and affidavits filed by the parties. After careful consideration of the submitted briefs, the evidence, and the applicable legal principles, the Court GRANTS Defendants' Motion to Exclude Expert Testimony of Dr. Malin Dollinger (docket no. 196). Because Dr. Dollinger's testimony is the Plaintiffs' sole evidence regarding specific causation, the Court also GRANTS Defendants' Motion for Summary Judgment Based on Plaintiffs' Lack of Admissible Proof (docket no. 191) and DISMISSES this case WITH PREJUDICE. All other pending motions are dismissed as moot.

## Background

This is a toxic tort case with federal jurisdiction under the Price–Anderson Act, 42 U.S.C. § 2210. *See Acuna v. Brown & Root, Inc.*, 200 F.3d 335, 339 (5th Cir. 2000). The Plaintiffs include fifty-three individuals who have or have had various forms of cancer and numerous related claimants.[1] The individuals with cancer

resided or worked in or around Karnes County, Texas, where the Defendants engaged in uranium mining and milling activities. Uranium was discovered in Karnes County in 1954 and the first uranium mill began operating in 1961 near Falls City. The uranium was removed from the ground and transported to the mills, where the natural uranium was extracted from the ore to produce yellowcake. The waste material, called tailings, was placed in tailings piles or ponds around the facility. The uranium mills were decommissioned in the early 1980s and the tailings ponds were capped and closed by the early 1990s.

Plaintiffs allege that their exposure to ionizing radiation from the uranium ore and its decay products caused their cancers. Natural uranium is primarily U–238 (99.27%),[2] and thus Plaintiffs' primary exposure from the uranium ore is exposure to U–238 and its decay products. The half-life of U–238 is $4.5 \times 10^9$ years, which results in a low decay rate. Although natural uranium is radioactive, it is considered weakly radioactive. ATSDR 1999, Toxicological Profile for Uranium ("Natural uranium is radioactive but poses little radioactive danger because it gives off very small amounts of radiation.") Uranium emits ionizing radiation.[3]

1. The claims of one Plaintiff, Hilaria Cano, have been dismissed on the basis of res judicata. *See* docket no. 276.

2. Natural uranium also includes U–235 (.72%) and U–234 (.006%). Natural uranium is found in various quantities in most rocks and soils and is the main source of natural radiation exposure to people out of doors. *In re TMI*, 193 F.3d 613, 645 (3d Cir.1999); ATSDR 1999, Toxicological Profile for Uranium at 1. People eat and drink minute amounts of natural uranium every day with their food and water intake. ATSDR 1999 at 7.

3. Radioactivity is the process by which unstable nuclei seek stability. *In re TMI*, 193 F.3d at 632. Frequently, the original unstable nucleus decays to another radioactive nucleus,

called a daughter nucleus. *Id.* The decay chain for U–238 includes radioactive daughters such as Thorium, Radium, and Radon, and eventually results in Lead–206, a stable compound. During the process of radioactive decay, the nucleus spontaneously emits an alpha or beta particle, often accompanied by one or more gamma rays. *Id.* at 633. Alpha particles are only capable of penetrating matter a small distance. *Id.* at 633. Because they lose energy rapidly over distance, they do not penetrate matter deeply and cannot penetrate the layer of dead cells on the surface of skin. *Id.* at 637 n. 36. A beta particle has a greater penetrating ability than an alpha particle, and may penetrate up to several centimeters into the body. *Id.* at 634, 637 n. 36. Gamma radiation is electromagnetic radiation emitted in the form of photons by nuclei

Plaintiffs suffer from many different types of cancer, including lung, bladder, colorectal, pancreatic, kidney, skin, breast, uterine, esophageal, liver, stomach, bone, brain, and leukemia. Plaintiffs contend that they were exposed to uranium primarily as a result of Defendants' hauling ore from the mine to the mill in uncovered trucks, allowing the uranium ore to fall from the trucks and uranium dust to blow off the trucks. Plaintiffs further contend that, with each additional vehicle that passed over the road, the ore was crushed and the resulting particles were suspended in the air. Due to this resuspension of particulates in the air with each passing vehicle, Plaintiffs allege that uranium and its progeny were dispersed in their community and that, as a result, Plaintiffs were exposed to ionizing radiation through inhalation and ingestion of the ore dust and contaminated food and water, which caused their cancers. They also attribute additional exposure to direct gamma radiation from the haul roads, facilities' tailings pile, and from the uranium at the facilities themselves (for workers and plant visitors).[4]

■ Under the Price–Anderson Act, any public liability action arising out of a nuclear incident is deemed to arise under the Act. However, the substantive rules of decision are governed by state law to the extent it does not conflict with the Act. 42 U.S.C. § 2214(hh). The Plaintiffs' burden under Texas law is to prove to a reasonable degree of medical certainty, based on a reasonable medical probability and scientifically reliable evidence, that their exposure to ionizing radiation from the natural uranium ore and its progeny was a cause of their injuries. *Black v. Food Lion, Inc.*, 171 F.3d 308, 310 (5th Cir.1999). In toxic tort cases such as this one, causation is often discussed in terms of general and specific causation. *See Merrell Dow Pharmaceuticals, Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex.1997). General causation deals with whether a substance is capable of causing a particular injury or condition in the general population, and specific causation deals with whether a substance caused a particular individual's injury. *Id.*

Plaintiffs have designated five experts in this case, all of whom have been challenged by the Defendants. On March 1 and 2, 2005, this Court held a hearing to consider Defendants' challenges to four of those experts.[5] Dr. Dollinger is the only expert offered to testify on the issue of specific causation, and exclusion of his testimony would necessitate a grant of summary judgment in favor of Defendants.[6] Thus, because the Court concludes that the testimony of Dr. Malin Dollinger is not admissible under *Daubert* and the Federal Rules of Evidence, the Court need not

in excited states of energy. *Id.* at 634. Gamma rays do not have mass or charge, and they are therefore capable of much greater penetration of matter than alpha or beta particles. *Id.* at 634, 637 n. 36.

4. This Court has previously held that, inasmuch as certain Plaintiffs' claims are based on their exposure at work, claims arising out of such work-based exposure are barred by the workers' compensation exclusivity provisions. *See* docket no. 279.

5. The Court heard the testimony of Dr. Marvin Resnikoff, a health physicist who created dose estimates for the Plaintiffs, Dr. William Au, a toxicologist, Dr. Richard Clapp, an epidemiologist offered to testify regarding general causation, and Dr. Dollinger, a medical doctor offered to testify on specific causation. No hearing was held on Dr. Rosalie Bertell, Plaintiff's rebuttal expert.

6. Although it appeared that Plaintiffs were attempting to establish specific causation through the testimony of Dr. William Au, Dr. Au testified at the hearing that he was not offering testimony on specific causation. *Daubert* hearing at 457–58.

consider the other *Daubert* challenges to Plaintiffs' experts.

## Applicable Law Regarding Expert Testimony

In 1993, the United States Supreme Court issued its seminal decision, *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), in which it established the standard for admitting expert scientific testimony in a federal trial. In *Daubert,* the Court abandoned *Frye*'s "general acceptance" test as the dominant standard for determining admissibility, noting that it had been superseded by the adoption of the Federal Rules of Evidence. *Id.* at 587–89, 113 S.Ct. 2786. The Court noted that, "under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589, 113 S.Ct. 2786. Thus, the Court held that, "[f]aced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset ... whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592, 113 S.Ct. 2786. "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93, 113 S.Ct. 2786. Ordinarily, "a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested." *Id.* at 593, 113 S.Ct. 2786. Another pertinent consideration is whether the theory or technique has been subjected to peer review and publication; however, publication is not a sine qua non of admissibility. *Id.* In the case of a particular scientific technique, the court should ordinarily consider the known or potential rate of error and the existence and mainte-

nance of standards controlling the technique's operation. *Id.* at 594, 113 S.Ct. 2786. Finally, "'general acceptance' can yet have a bearing on the inquiry." *Id.* Widespread acceptance can be an important factor in ruling particular evidence admissible, and "'a known technique that has been able to attract only minimal support within the community' may properly be viewed with skepticism" *Id.* (citation omitted).

The inquiry is a flexible one, and its focus must be solely on principles and methodology rather than the conclusions generated. *Id.* at 594–95, 113 S.Ct. 2786. However, conclusions and methodology are not entirely distinct from one another. *General Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Nothing in *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. *Id.* A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered. *Id.*

Federal Rule of Evidence 702 embodies these reliability principles. It requires the district court to consider: (1) whether the knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue; (2) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education; (3) whether the testimony is based upon sufficient facts or data; (4) whether the testimony is the product of reliable principles and methods; and (5) whether the witness has applied the principles and methods reliably to the facts of the case. FED.R.EVID. 702. The party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reli-

able. *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir.1998). This requires some objective, independent validation of the expert's methodology. *Id.*

The Fifth Circuit has directed that, "[i]n the vast majority of cases, the district court first should decide whether the factors mentioned in *Daubert* are appropriate. Once it considers the *Daubert* factors, the court then can consider whether other factors, not mentioned in *Daubert*, are relevant to the case at hand." *Black v. Food Lion, Inc.*, 171 F.3d 308, 311–12 (5th Cir.1999). "[W]hether *Daubert*'s suggested indicia of reliability apply to any given testimony depends on the nature of the issue at hand, the witness's particular expertise, and the subject of the testimony." *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 372 (5th Cir.2000). It is a fact-specific inquiry. *Id.* The district court's responsibility "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* Further, "the law cannot wait for future scientific investigation and research. We must resolve cases in our courts on the basis of scientific knowledge that is currently available." *Moore*, 151 F.3d at 276.

### Applicable Law Regarding Causation

#### Burden of Proof

Under Texas law, the Plaintiffs' burden of proof on causation is as follows:

The two elements of proximate cause are cause in fact (or substantial factor) and foreseeability. *Id.; Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992). These elements cannot be satisfied by mere conjecture, guess, or speculation. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995). Cause in fact is established when the act or omission was a substantial

factor in bringing about the injuries, and without it, the harm would not have occurred. *Id.; Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex.1995); *Travis*, 830 S.W.2d at 98. In *Lear Siegler, Inc. v. Perez*, [819 S.W.2d 470 (Tex. 1991)], we found the Restatement (Second) of Torts to be instructive on this point:

In order to be [the proximate cause] of another's harm, it is not enough that the harm would not have occurred had the actor not been negligent. . . . [T]his is necessary, but it is not of itself sufficient. The negligence must also be a substantial factor in bringing about the plaintiff's harm.

*IHS Cedars Treatment Ctr. of Desoto, Tex. v. Mason*, 143 S.W.3d 794, 798–99 (Tex. 2004). Thus, Plaintiffs must establish that it is more likely than not that Plaintiffs would not have suffered from their various cancers but for the Defendants' activities related to the uranium mining and milling and that their exposures were a significant factor in bringing about their cancers. *See Southwest Key Program, Inc. v. Gil–Perez*, 81 S.W.3d 269, 275 (Tex.2002) (reversing jury verdict for plaintiff because evidence did not establish that it was more probable than not that plaintiff would not have been injured but for defendant's failure to provide ordinary protective gear); *see also Restatement (Third) of Torts* § 26 cmt. 1 ("[A] plaintiff must prove that it is more likely than not that, if the defendant had not acted tortiously, the plaintiff's harm would not have occurred. Consistent with Comment *c*, plaintiff need not prove that defendant's tortious conduct was the predominant or primary cause of the harm. So long as the defendant's tortious conduct was more likely than not *a* factual cause of the harm, plaintiff has

established the element of factual cause.").[7]

### Toxic Torts & Epidemiology

In toxic tort cases, direct human experimentation cannot be done, and generally there will be no direct evidence of causation. *Havner*, 953 S.W.2d at 715. In such cases, claimants may attempt to demonstrate that exposure to the substance at issue increases the risk of their particular injury. *Id.* One method of demonstrating an increased risk is through epidemiological studies, which examine existing populations to determine if there is an association between a disease or condition and a factor suspected of causing that disease or condition. *Id.* The Fifth Circuit has noted that, in toxic tort cases, "the most useful and conclusive type of evidence ... is epidemiological studies." *Brock v. Merrell Dow Pharms., Inc.*, 874 F.2d 307, 311 (5th Cir. 1989), *modified by* 884 F.2d 166 (5th Cir. 1989). Thus, although the Fifth Circuit has not held that "epidemiologic proof is a necessary element in all toxic tort cases, it is certainly a very important element." *Id.* at 313. This is especially true when the only other evidence is of questionable applicability, such as animal studies. *Id.*

As the Texas Supreme Court has recognized, there is some disagreement over the use of epidemiological studies to establish causation in the litigation context. *Havner*, 953 S.W.2d at 717. The Texas Supreme Court has concluded that "properly designed and executed epidemiological studies may be part of the evidence supporting causation in a toxic tort case and that there is a rational basis for relating the requirement that there be more than a 'doubling of the risk' to ... the more likely than not burden of proof." *Id.* Courts adopting such a requirement have found that the requirement of a more than 50% probability means that epidemiological evidence must show that the incidence of an injury or condition in the exposed population was more than double the incidence in the unexposed or control population. *Id.* at 716. This may be reflected as a "relative risk" of greater than 2.0.[8] Even if an epidemiological study satisfies the doubling of the risk criteria, however, other factors must still be considered. *Id.* at 718–19 (noting that conclusions about causation should not be drawn until other criteria, such as the Bradford–Hill or Henle–Koch–Evans Postulates are considered).[9] As the Court noted, the Bradford–

---

7. Because Dr. Dollinger has testified that each possible cause of the Plaintiffs' cancers (as discussed further below) is a but-for cause and Plaintiffs have not argued differently, the Court concludes that Plaintiffs have not alleged that radiation from Defendants' activities and the other possible causes of Plaintiffs' cancers are "multiple sufficient causal sets" such that the but-for test should be modified.

8. Relative risk is a commonly used approach for expressing the association between an agent and disease, and is defined as the ratio of the incidence rate of disease in exposed individuals to the incidence rate in unexposed individuals. The incidence rate of disease reflects the number of cases of disease that develop during a specified period of time divided by the number of persons in the cohort under study. Federal Judicial Center Reference Manual on Scientific Evidence at 348 (2nd ed.2000)(hereinafter referred to as "Ref-

erence Manual"). If the relative risk is greater than 1.0, the risk in exposed individuals is greater than the risk in unexposed individuals; in other words, there is a positive association between exposure to the agent and the disease, which could be causal.

9. The Reference Manual cautions that "[a]lthough relative risk is a straightforward concept, care must be taken in interpreting it. Researchers should scrutinize their results for error. Error in the design of a study could yield an incorrect relative risk. Sources of bias and confounding should be examined. Whenever an association is uncovered, further analysis should be conducted to determine if the association is real or due to an error or bias. Similarly, a study that does not find an association between an agent and disease may be erroneous because or bias or random error." Reference Manual at 349.

Hill criteria[10] and the Henle–Koch–Evans Postulates "are part of sound methodology generally accepted by the current scientific community." *Id.* at 719. Particularly where direct experimentation cannot be done, it is important that any conclusions about causation be reached only after an association is observed in studies among different groups and that the association continues to hold when the effects of other variables are taken into account. *Id.* at 727. In addition, to support causation, an epidemiological study must be statistically significant at the 95% confidence level and the confidence interval may not include 1.0. *Id.* at 723–24.[11] The Texas Supreme Court left open the question "whether epidemiological evidence with a relative risk less than 2.0, coupled with other credible and reliable evidence, may be legally sufficient to support causation." *Id.*

### Applicability of Havner

█ Because federal procedure and state substantive law govern this case, the parties disagree over the controlling effect of the Texas Supreme Court's decision in *Havner*. Plaintiffs are correct that the admissibility of expert testimony is a procedural issue, and this Court agrees that the admissibility of the proffered experts is governed by federal law. However, the Court disagrees with Plaintiffs regarding the controlling effect of *Havner*. Plaintiffs repeatedly argue that *Havner* "is not substantive law and is not controlling on this Court because it was decided on evidentiary grounds."[12] However, *Havner* was not concerned with the *admissibility* of expert testimony, but the *legal sufficiency* of that evidence, although the inquires are conflated under Texas law in the context of expert testimony. The Court concludes that whether a Plaintiff's proffered evidence amounts to some evidence (or, in other words, legally sufficient evidence) of causation is a question of Texas substantive law, and thus *Havner* controls on that issue.[13] If evidence is admissible under federal procedural law but fails to constitute "some evidence" under Texas substantive law, the Plaintiffs' victory on the admissibility question would be a hollow one, as the evidence would be deemed insufficient as a matter of law to survive summary

10. The Bradford–Hill criteria include (1) the strength of association; (2) consistency of association; (3) specificity of association; (4) temporality; (5) biological gradient or dose-response relationship; (6) plausibility; (7) coherence; (8) experimental evidence; and (9) analogy. *Havner*, 953 S.W.2d at 718 n. 2.

11. *See also Brock,* 874 F.2d at 311.

12. *See, e.g.,* Plaintiffs' Reply to Defendants' Brief in Opposition to Plaintiffs' Motion to Exclude Testimony of Dr. Fred Mettler (docket no. 262) at 3.

13. The Court acknowledges that, in a vacated opinion, the Fifth Circuit stated that *"Havner* amounts to the Texas Supreme Court's definition of 'more likely than not burden of proof.' Arguably, the definition of the applicable burden of proof is procedural rather than substantive, and therefore controlled by federal rather than state law." *Bartley v. Euclid,* 158 F.3d 261, 273 n. 9 (5th Cir.1998). However, this equivocal statement was dicta given that the parties neither briefed nor argued the issue and it was not outcome determinative— thus, the Court declined to reach it. *Id.* Moreover, as noted, that opinion was vacated, and thus, the Court is not bound by it. With all due respect, this Court disagrees with the characterization that *Havner* is simply a procedural definition of the more likely than not burden of proof. Rather, *Havner* is substantive law in that it delineates what proof is required to sustain the plaintiff's burden of proof on causation. *See Raleigh v. Ill. Dept. of Revenue,* 530 U.S. 15, 21, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000) ("[W]e have long held the burden of proof to be a 'substantive' aspect of a claim."); *Raynor v. Merrell Pharmaceuticals, Inc.,* 104 F.3d 1371, 1376 (D.C.Cir. 1997) ("The question of sufficiency would be a substantive rule under *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and therefore governed by District of Columbia law.").

judgment. Moreover, whether expert testimony will assist the trier of fact is governed in part by whether the testimony is relevant to the plaintiff's burden of proof under the substantive law, and testimony that will not assist the trier of fact by advancing an element of the plaintiff's case should be excluded. *See Daubert v. Merrell Dow Pharms.*, 43 F.3d 1311, 1320 (9th Cir.1995) ("In assessing whether the proffered expert testimony 'will assist the trier of fact' in resolving this issue, we must look to the governing substantive standard...."); *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 n. 2 (10th Cir. 2005) ("Under the relevance prong of *Daubert*, the court must ensure that the proposed expert testimony logically advances a material aspect of the case."). Thus, the Court concludes that *Havner* controls the issue of what evidence is required to establish causation in a toxic tort case and therefore what evidence is relevant.

In *Havner*, the Court was considering whether the Plaintiffs had introduced legally sufficient evidence that Bendectin caused the plaintiff's birth defect. Plaintiffs argue that *Havner* does not apply to this case because it is limited to the Bendectin context. In *Havner*, the Court was deciding whether the plaintiff's proof of causation was sufficient in an area in which the harmful nature of Bendectin was quite unsettled and available epidemiological evidence failed to support causation. In contrast, Plaintiffs contend, the harmful nature of ionizing radiation and its potential to cause cancer is well accepted by the medical and scientific community, and has

been recognized by the courts. *See, e.g., In re TMI*, 193 F.3d 613 (3d Cir.1999).

Although *Havner* was a Bendectin case, the Court spoke generally about the use of epidemiological evidence and how the doubling of the risk standard relates to the "more likely than not" burden of proof, and the Court does not read the opinion to limit those principles solely to the Bendectin context.[14] Plaintiffs rely not on Texas cases, but on federal cases dealing with causation in the radiation context—*In re TMI*, 193 F.3d 613 (3d Cir.1999), *amended by* 199 F.3d 158 (2d Cir.2000), which dealt with litigation resulting from the Three Mile Island nuclear reactor accident, and *In re Hanford Nuclear Reservation Litigation*, 292 F.3d 1124 (9th Cir.2002) and *In re Berg Litigation*, 293 F.3d 1127, 1129 (9th Cir.2002), which dealt with the radiation release from the Hanford Nuclear Reservation.

In *In re TMI*, 193 F.3d 613 (3d Cir. 1999), the court considered the claims of area residents who allegedly developed radiation-induced neoplasms as a result of ionizing radiation released into the environment as a result of the Three Mile Island nuclear reactor accident in 1979. Specifically, the plaintiffs alleged that their conditions were caused by gamma ray exposure from radioactive iodine, xenon, and krypton. *Id.* at 659. The Third Circuit held that, to recover for their injuries, the plaintiffs had to show that the defendants released radiation into the environment in excess of the federal regulatory limits, that plaintiffs were exposed to this radiation (although not necessarily at levels prohibit-

---

**14.** Lower Texas courts have noted that "[d]espite Justice Spector's conclusion that *Havner* gives no practical guidance outside the context of Bendectin litigation, the majority does set out guidelines that [lower courts] must follow." *Minnesota Mining & Mfg. Co. v. Atterbury*, 978 S.W.2d 183, 191 n. 4 (Tex. App.–Texarkana 1998, pet. denied). Further,

Texas courts of appeals have applied *Havner* and the doubling of the risk requirement in non-Bendectin cases, even when there is a known association between the toxic agent and the plaintiff's injury. *See Frias v. Atlantic Richfield Co.*, 104 S.W.3d 925, 928 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (benzene).

ed by the regulations), that the plaintiffs were injured, and that the radiation exposure was the cause. *Id.* The court held that the "exposure element requires that plaintiffs demonstrate they have been exposed to a greater extent than anyone else, i.e., that their exposure levels exceeded the normal background level." *Id.*

The Third Circuit also rejected the district court's holding that all plaintiffs had to present evidence that they were exposed to 10 rem or more of ionizing radiation in order "to establish causation on the basis of a specific radiation exposure level." *Id.* at 726. The court noted that, at exposure levels below 10 rem, cancer risks are based on extrapolations from risks seen at higher exposure levels, but the fact that risks of cancer from exposure at low doses are based on extrapolations from higher doses does not mean that the scientific community believes that there is no causal connection between a low-level exposure and cancer induction. *Id.* On the contrary, the court noted, it is possible that very low doses of ionizing radiation may deposit sufficient energy into a cell to adversely modify it and scientists assume no threshold for cancer induction. *Id.* Thus, the court concluded that the "nontrial" plaintiffs "ought to be able to attempt to establish that doses below the [10 rem] threshold ... has induced their neoplasms." *Id.*

In *In re Hanford Nuclear Reservation Litigation*, 292 F.3d 1124 (9th Cir.2002), the district court established a threshold for generic causation—proof would meet the more-likely-than-not standard only if it established a doubling of the risk. Expert testimony indicating only that the radiation was capable of causing a disease was excluded as irrelevant unless it also passed muster under the "doubling of the risk" standard. *Id.* at 1132. The Ninth Circuit reversed, stating that "the appropriate understanding of generic causation is ...

whether exposure to a substance for which a defendant is responsible, such as radiation at the level of exposure alleged by plaintiffs, is capable of causing a particular injury or condition in the general population." *Id.* at 1133. The court further stated that cases dealing with substances for which there was no scientific evidence of capacity to cause the plaintiffs' injuries (and for that. reason statistical epidemiological evidence was necessary) are inapposite. *Id.* at 1136. In contrast, the court held, "[r]adiation is capable of causing a broad range of illnesses, even at the lowest doses." *Id.* at 1137. Thus, to show generic causation, plaintiffs had to establish by scientific evidence only that radiation was capable of causing the types of injuries plaintiffs suffered, and the district court erred in requiring epidemiological evidence that would require a plaintiff to prove exposure to a specific threshold level of radiation that created a relative risk of greater than 2.0 at the general causation stage. *Id.*

The Ninth Circuit affirmed this conclusion in *In re Berg Litigation*, 293 F.3d 1127, 1129 (9th Cir.2002): "As we explained in *Hanford,* reliance on [the doubling dose] standard was error because the 'doubling of the risk' is a measure courts use to determine whether a substance is capable of causing harm in the absence of any evidence other than epidemiological evidence of toxicity. Here, we deal with a substance, radiation, that is known to be capable of causing harm. Indeed, there is no threshold harmful dosage level for radiation because it can cause harm at any level."

*Hanford* and *Berg's* rejection of the doubling of the risk standard was in the context of the court's discussion of general causation—whether ionizing radiation is capable of causing the plaintiffs' injuries. In *Hanford,* the plaintiffs offered expert

testimony to show the generic capacity of levels of radiation emitted from the Hanford facility to cause the illnesses experienced by the plaintiffs, and the Ninth Circuit held that evidence sufficient for general causation. *Id.* at 1137. It did not discuss the sufficiency of evidence to establish specific causation. *In re TMI* did not reject the doubling of the risk requirement; rather, it rejected the district court's imposition of a 10 rem threshold because it was inconsistent with scientific thinking.

The Court finds *TMI, Hanford,* and *Berg* instructive and agrees with Plaintiffs that the generic capacity of ionizing radiation to cause cancer is well accepted. However, regardless of whether one accepts the premise that ionizing radiation is generally capable of causing cancer, Plaintiffs must still prove that their particular exposures to ionizing radiation from the uranium ore contamination was the cause of their particular cancers. Whether they can do so will depend in large part on the strength of the epidemiological evidence, which, although establishing generally that various exposures to ionizing radiation from various sources may cause the forms of cancer involved here, is "mixed and inconclusive" (to use Dr. Dollinger's words [15]) with regard to a causal link between exposure to natural uranium ore and cancer. Given that cancer is a common phenomenon with many causes, both known and unknown, without epidemiological evidence demonstrating a relative risk of greater than 2.0, Plaintiffs will have a more difficult time reliably establishing that an individual's cancer was, more likely than not, caused by Defendants' conduct.

In addition, to establish specific causation, a claimant must not only introduce sufficient epidemiological evidence, he must also show that he is similar to those in the studies, which includes "proof that the injured person was exposed to the same substance, that the exposure or dose levels were comparable to or greater than those in the studies, that the exposure occurred before the onset of injury, and that the timing of the onset of injury was consistent with that experienced by those in the study." *Havner*, 953 S.W.2d at 720. Consistent with these requirements under Texas law, the Eighth Circuit has held that a plaintiff in a toxic tort case must "prove the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance" before he may recover. *Wright v. Willamette Industries, Inc.*, 91 F.3d 1105, 1106 (8th Cir. 1996). "It is not enough for a plaintiff to show that a certain chemical agent sometimes causes the kind of harm that he or she is complaining of. At a minimum, ... there must be evidence from which the factfinder can conclude that the plaintiff was exposed to levels of that agent that are known to cause the kind of harm that the plaintiff claims to have suffered. We do not require a mathematically precise table equating levels of exposure with levels of harm, but there must be evidence from which a reasonable person could conclude that a defendant's emission has probably caused a particular plaintiff the kind of harm of which he or she complains before there can be a recovery." *Id.* at 1107. Though the plaintiffs proved they were exposed to defendant's emissions, they failed to produce evidence that they were exposed to a hazardous level of formaldehyde, and thus their case failed. *Id.*

In *Allen v. Pennsylvania Engineering Corp.*, 102 F.3d 194 (5th Cir.1996), the Fifth Circuit considered whether the plaintiff had produced sufficient evidence that ethylene oxide caused the plaintiff's brain cancer. The court noted that "the fact

---

15. Dollinger 2003 Deposition at 540.

that EtO has been classified as a carcinogen by agencies responsible for public health regulations is not probative of the question whether Allen's brain cancer was caused by EtO exposure." *Id.* at 195–96. Citing *Wright,* the Fifth Circuit stated that "[s]cientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiff's burden in a toxic tort case." *Id.* at 199 (cited with approval in *Curtis v. M & S Petroleum, Inc.,* 174 F.3d 661, 670 (5th Cir.1999)).

Just last year, in *Burleson v. Texas Department of Criminal Justice,* 393 F.3d 577 (5th Cir.2004), the Fifth Circuit considered the admissibility of expert opinion testimony in a case alleging that a prison inmate's cancer was caused by his exposure to radioactive particles in thoriated tungsten rods used during his prison welding operations. The plaintiff worked as a welder and performed tungsten inert gas welding activities using 2% thoriated tungsten steel welding electrodes. These electrodes were radioactive and the warning on the box indicated that exposure to them may cause cancer. The thorium in the welding rods was present in the form of thorium dioxide, a naturally occurring radioactive compound that is distributed in the air during the welding and grinding processes, and which has been classified by the Department of Health and Human Services as a carcinogen. Burleson developed throat and lung cancer, as did four other individuals employed as welders. The Court noted, however, that Burleson also had a forty-five year, two-pack-per-day history of smoking and both his parents and maternal grandparents died of cancer.

To support his causation claim, Burleson presented the expert witness testimony of Dr. Arch Carson, a well-credentialed toxicologist and expert in occupational medicine, who opined that Burleson inhaled hazardous radioactive particles while engaging in welding operations, in turn exposing him to a significant risk for the development of respiratory tract cancers, and that that risk exceeded Burleson's other risk factors. Dr. Carson espoused a "radiation hot spot" theory according to which the primary risk factor for cancer is the local microscopic dose of radiation that is received by the one cell that transforms into cancer, not the total dose of radiation to the body, and asserted that this theory has been proven in practice and that published scientific and epidemiological studies show that patients who received Thorotrast—a form of thorium dioxide used as a medical imaging dye—during its thirty-year use developed multiple types of cancer.

Burleson attempted to distinguish the Fifth Circuit's prior *Allen* opinion on the basis that there are epidemiological studies that clearly link thorium dioxide, a known carcinogen, with cancer, and there are no such studies disproving the theory that welding with thoriated tungsten welding rods causes lung or throat cancer. He further argued that there is no legal requirement that a plaintiff produce epidemiological studies concerning a specific use of the same known carcinogen in order to create a genuine issue of material fact concerning the causal relationship between lung and throat cancers and thorium dioxide in welding electrodes. The Court rejected these arguments, noting that Dr. Carson offered "no studies which demonstrate a statistically significant link between thorium dioxide exposure in dust or fumes and Burleson's type of lung or throat cancer. The U.N. report relied upon by Dr. Carson only reports that liver, spleen and bone cancers were associated with Thorotrast. . . . Additionally, one of the few, if not the only, epidemiology study which examined the cancer risk to welders

from thoriated welding electrodes was a Danish study that showed no statistically significant link between the exposure to thoriated welding electrodes and cancer. Here, as in *Allen*, there are no epidemiological studies supporting a correlation between the suggested causative agent and the type of cancer experienced by the plaintiff. Accordingly, we find *Allen* undistinguishable." The Court went on to criticize Dr. Carson's failure to determine the dose, and eventually concluded that "[s]ince Dr. Carson cannot show that the welding electrodes are more or less probable to be the cause of Burleson's cancers, the testimony is irrelevant under the Federal Rules of Evidence."

With these legal standards in mind, the Court now turns to a specific examination of Plaintiffs' proffered expert witness Dr. Malin Dollinger.

### Dr. Malin Dollinger, M.D., F.A.C.P.'s Opinions and the Parties' Arguments

Plaintiffs seek to introduce Dr. Dollinger's testimony to show that Defendants caused the Plaintiffs' cancers (specific causation). Dr. Dollinger is a well-credentialed clinical professor of medicine at the University of Southern California School of Medicine. He received his undergraduate and medical degrees at Yale, and completed a residency in internal medicine, with a three-year fellowship in medical oncology. He is currently in the private practice of medical oncology in California. Dr. Dollinger states that, on the basis of his education, training, and experience, he is familiar with the risk factors and causes for the various types of cancer in man, in particular those cancers caused by radiation, as well as the natural history, diagnosis, treatment, and prognosis of the different types of cancer in man.

#### August 2002 report

According to his 2002 report, in reaching his conclusions, Dr. Dollinger reviewed the plaintiffs' medical records. He also reviewed various studies and literature concerning ionizing radiation, including uranium, and Dr. Resnikoff's August 2002 dose reconstruction report. Dr. Dollinger made two visits to Karnes County to conduct independent medical examinations on available Plaintiffs or he conducted interviews with relatives when the case subjects were not available for examination.

Referring to Dr. Resnikoff's report, Dr. Dollinger states that "estimates were made regarding exposures to various radioactive and non-radioactive materials, for each of the various subjects.... The findings outlined appear to be and are considered accurate." Dollinger 2002 Report at 15. He further asserts that "plaintiffs have been exposed to radioactive decay products, which include alpha radiation, gamma rays, radon and radon daughters, and other products of radioactive decay, as well as radioactive dust, radioactive particles, heavy metals, and other contamination caused by the uranium mining and milling activities." *Id.* He also states that Resnikoff's "reports and conclusions appear to be conducted in a reasonable, sound, logical, and scientific manner, and [he has] assumed that these studies, measurements, and data furnish accurate and reliable information on radiation exposures of each individual to the various contaminants. Excessive exposure to sources of ionizing radiation was demonstrated and documented." *Id.* at 16. Dr. Dollinger states that in his interviews with plaintiffs, he confirmed their employment, location of homes, proximity to haul roads, and in general obtained a first-hand knowledge of conditions as they existed at the time of exposure, and though he did not attempt to repeat the details of each plaintiff's exposure, his discussions did confirm certain information as provided in Resnikoff's report. Thus, his report "assume[s] that such contamination by radioactive materi-

als did in fact occur, at dosage levels higher than background radiation." *Id.* at 17. Dollinger's report "is primarily concerned with the questions of specific causation of the various plaintiffs' specific cancers by such radiation/radioactive material, and toxic material exposure. In other words, was their exposure to ionizing radiation and toxic materials resulting from the activities of defendants a cause or a substantial contributing factor in the production of subjects' cancers?" *Id.* at 17–18.

Dr. Dollinger states that the radioactive materials of concern produce ionizing radiation, which produces damage in biological systems through ionization of molecules. *Id.* at 18. With regard to DNA damage, he states that ionizing radiation is much more likely to produce double-strand breaks with impaired ability to repair, compared to single-strand breaks (for example, from chemical carcinogens). *Id.* at 19. In the case of exposure to ionizing radiation, Dr. Dollinger states that there is no minimum threshold of exposure that is required to produce genetic mutations that may lead to abnormalities, including cancer. *Id.* He points out that the effects of ionizing radiation are "stochastic," which means that: (1) there is no threshold; even a very small dose (for example, a single radiation track) can produce a key genetic mutation leading to cancer; (2) increasing doses of radiation produce a higher risk of genetic damage (at least two "hits," and usually more, are required to produce a cancer mutation, and thus prolonged exposure would favor the occurrence of several hits); and (3) once the key genetic damage occurs, the effect is independent of the dose required to produce it.

*Id.* at 19–20. Thus, regardless of the dose, once a cell is damaged, it is permanent in that cell and cancer will develop if not controlled by the body. *Id.*

Dr. Dollinger cites Fairlie for the proposition that, "for the majority of tumor types, a single mutational event in a single target cell *in vivo* [in the body] can create the potential for neoplastic [cancer] development. On this basis, a single radiation track (the lowest dose and dose rate possible) traversing the nucleus [central point] of an appropriate target cell has a finite possibility, albeit low, of generating the specific damage that results in a tumor initiating mutation." *Id.* at 20. Thus, because even a single ionization event is capable of producing critical DNA damage leading to cancer mutation, there is no threshold dose of ionizing radiation that is "safe." *Id.* Dr. Dollinger states that industry guidelines serve as convenient parameters, but do not define a "safe" dose. *Id.* at 20–21. Even the industry standard of "as low as reasonably achievable (ALARA)" is still an amount of ionizing radiation capable of producing biological effects that lead the cancer. *Id.* at 21.

Dr. Dollinger also states that there are two additional factors of importance. First, the health effects on humans of more than one toxic material or exposure may be additive or synergistic,[16] and thus it is "quite likely" that the risk of chromosomal damage from ionizing radiation may be increased due to repeated exposures over time as well as the presence of multiple sources of ionizing radiation. *Id.* "Specifically, exposures like those experienced by these subjects in Texas, that is expo-

16. In his deposition, Dr. Dollinger was asked whether, "[i]n evaluating the causes of any of the cancers of the plaintiffs here, have you concluded that the cancer was caused at least in part by the synergistic effect of the interaction of ionizing radiation and any other causative agent?" He replied, "Not specifically synergistic, in answer to your question. I don't know if I could determine whether the combined effect is more than what one would expect on the basis of each alone. I simply have noted that there may be more than one cause." Dollinger 2002 Deposition at 96.

sure to multiple radioactive sources, various isotopes, by various routes and at various times, over a prolonged interval of time, are more like to produce genetic (DNA) mutations, with the resulting risk of cancer. During the time interval during which exposure occurs, other exposures to radiation or other carcinogens may add and amplify the initial genetic damage." *Id.* Dr. Dollinger concludes that a "defined" and precisely monitored exposure by a worker during his shift may in fact be less worrisome regarding cancer induction than a continuous chronic exposure of unknown intensity, location, involvement of varying portions of the body, and degree of exposure internally, to an individual in the contaminated community who is exposed for long periods of time. *Id.* at 22. In addition, the genetic damage caused by ionizing radiation may take years to develop into cancer and thus the damage may not be apparent for a long time. For example, the studies of Japanese atomic bomb survivors showed that solid tumors may not develop for forty years, and thus surveys done at shorter time intervals may miss detection of many solid tumors. *Id.* Dr. Dollinger states that the second additional important factor relates to the pathway of exposure.[17] *Id.* at 23.

Dr. Dollinger notes that regulators apply the linear non-threshold hypothesis, and states that "[t]his model is widely accepted" and "accurately reflects the mechanism by which ionizing radiation induces cancer and other damaging effects." *Id.* He cites Fairlie and Resnikoff's 1996 mortality study of the Japanese atomic-bomb survivors as showing a statistically significant upward trend of risk with doses in the region of 50 mSv, which reinforces the validity of the no-threshold concept.

*Id.* at 25. Further, Dr. Dollinger asserts that "Straume points out that high energy gamma rays (e.g. the Japanese exposure) are expected to be substantially less effective in producing biological damage compared with lower energy radiation." *Id.* Thus, he asserts, "[a]cute leukemia was clearly evident as a result of radiation exposure in those cities in Japan, and it would be expected that the lower energy [gamma rays] produced in the present situation would be even more effective biologically than the high energy gamma rays in the Japanese exposure." *Id.* at 25–26.

Dr. Dollinger states that many sources of data verify and document that existence of radiation-induced cancers. *Id.* at 23. Further, ionizing radiation has the ability to produce cancer regardless of the particular source of the ionizing radiation. *Id.* at 26. Dr. Dollinger states that the "harmful effects of ionizing radiation on the blood and blood-forming organs (hematopoietic system) has been known for many decades." *Id.* at 27. The effects of ionizing radiation have been intensively studied. *Id.*

Dr. Dollinger states that because of the latency period and high incidence of naturally occurring cancers, the more common ones in particular, the increase in cancer incidence that is caused by radiation exposure is difficult to detect in epidemiological studies of large exposed populations. *Id.* at 29. This does not mean, however, that each exposed individual's risk was not significantly increased. *Id.* Rather,

[s]pecifically, for those individuals who do develop cancer, the ionizing radiation resulting from the environmental contamination was a substantial contributing factor and a cause of the cancer

---

17. Though Dr. Dollinger makes this statement, he does not expand upon this statement other than to state that the tailings are a slurry and drying and aerosolization of the slurry would result in the production of radioactive particles and that radioactive material/"dust" falling off ore trucks would create a similar pathway of exposure. *Id.* at 23.

which developed. The increase in risk of each exposed individual increases linearly with the increase in dose. For each individual, the development of cancer is an "all or nothing" phenomenon. For each exposed individual who did develop cancer, the risk for that person was 100%.

*Id.*

Dr. Dollinger states that ionizing radiation has been invoked as a causative factor for acute leukemia, chronic myelogenous leukemia, thyroid cancer, breast cancer, lung cancer, stomach cancer, colorectal cancer, esophageal cancer, bladder cancer, ovarian cancer, multiple myeloma, and pancreatic cancer, and less frequently, kidney cancer, lymphoma, skin cancer, rectal cancer, bone cancer, uterine cancer, and connective tissue cancer (sarcomas). *Id.* at 29. Further, "radiation exposure has also been implicated in tumors of the central nervous system (brain)." *Id.*

Dr. Dollinger further states that because the genetic changes that result in cancer production are microscopic, and since each cancer is caused by a series of "hits" to various genes, it is not possible, in almost all cases, to determine which environmental insult or which radiation (or other) "hit" caused a specific genetic mutation that resulted in the first cancer cell. *Id.* at 30. The cancer that results from one cause (such as smoking) are the same types of cancer that may result from another cause, such as radiation exposure. *Id.* Indeed, many cancers in the general population are likely caused by "background" ionizing radiation, but it is not possible to know which person's cancers are so-caused, and which may have other causes. *Id.* In fact, since a series of genetic mutations is responsible for most cancers, there may be several or multiple causes of an individual's cancer, and the chromosome changes and mutations from one cause are not distinguishable, with

rare exception, from those induced by another cause. *Id.* Epidemiologists attempt to determine if a certain population that has been exposed to a carcinogenic substance such as ionizing radiation has a higher incidence of cancer than an unexposed control population. *Id.* Dr. Dollinger states that detecting a real effect from ionizing radiation through epidemiological studies is difficult in both small and large populations. In large populations, the increase in cancer incidence caused by radiation contamination may be too small to detect by comparison to naturally occurring cancers, making it "inappropriate, therefore, to conclude that because an increase in cancer incidence is difficult to detect in population studies, that the risk of developing cancer in certain individuals has not increased." *Id.* at 32.

With regard to each specific plaintiff, Dr. Dollinger reviewed their personal and health information and medical records. He conducted an independent medical examination when possible. He determined each plaintiff's specific type of cancer and the relationship of that type of cancer to causation by ionizing radiation contaminating their environment. He also included data from Resnikoff's report concerning presence and degree/dose ranges of radiation exposure, and organ doses in some cases. He then created individual reports for each plaintiff. His expert medical opinion is that "[i]t is medically probable that ionizing radiation from radioactive materials, via contamination of the personal environment of these various individual subjects, was a substantial contributing factor and was a cause of the various cancers in these individuals that have occurred in the past or which are present now.... The development of these cancers is directly related to exposures of these subjects to various substances and materials produced by the defendants, said substances and materials producing

ionizing radiation that contaminated their general and specific environment. The location and periods of residence in this community and their exposures to such ionizing radiation has been well documented. Within reasonable medical probability,[18] the ionizing radiation produced as a result of the contamination acted as a carcinogen (a cause of cancer), and such exposure to ionizing radiation resulting from the environmental contamination was a cause and a substantial contributing factor in the development of these cancers, and the signs and symptoms, required treatment, and outcome that did result." *Id.* at 33–35.[19] Each of the reports that specifically pertain to individual Plaintiffs [20] are brief (less than one page), and indicate the Plaintiff's cancer diagnosis and treatment, whether the form of cancer has been associated with exposure to ionizing radiation, details regarding family history and exposure, the total effective radiation dose (and occasionally organ dose), and the conclusion that the ionizing radiation resulting from the contamination was a cause of the Plaintiff's cancer.

With respect to the four children Plaintiffs, Dr. Dollinger concluded that exposure of the subject's mother or father to ionizing radiation, either in isolation or in conjunction with the child's exposure, was a cause and substantial contributing factor in the development of the subject's cancer. For example, CarylAnn Hernandez was born in 1983 and developed an osteogenic sarcoma of her leg in September 1993. Dr. Dollinger noted that her total effective radiation dose was 328–869 mrem, that of her father David Hernandez was 836–2,004 mrem, and that of her mother Helen Hernandez was 357–1,259 mrem, and that "such exposure of this subject and her parents to such ionizing radiation was a cause and a substantial contributing factor in the development of this subject's cancer." Dollinger 2002 Report at 53. Crystal Yanta was born in 1982 and was diagnosed with leukemia in 1996. Similarly to CarylAnn Hernandez, Dr. Dollinger ap-

18. Dr. Dollinger testified that "within reasonable medical probability" means "that it is more likely than not" and that "there's at least a 51% probability." Dollinger 2002 Deposition at 67.

19. As noted previously, cause in fact requires a showing of both but-for causation and that the causative agent was a significant contributing factor. Although Dr. Dollinger's reports and affidavit do not expressly state that the radiation attributed to the Defendants' uranium-related activities are "but-for" causes of Plaintiffs' cancers, he does so expressly state in his deposition testimony. Dollinger 2002 Deposition at 19–20:

> Q Now is it your testimony that, but for that radiation that is attributed to the defendants in this case, these individuals would not have contracted the cancer that they contracted?
> A That's correct.

In addition, Dr. Dollinger testified at his deposition that "substantial contributing factor" is "an alternative to 'cause'" and "means that it was a cause in the production

of the cancer" in that "in the series of mutations that resulted in the cancer, it resulted in at least one of the mutations." *Id.* at 44. Further, he testified that the word "substantial" was "specifically chosen to avoid the word 'significant'" because "this is not a statistical concept." *Id.* Thus, "they [a cause and a substantial contributing factor] are essentially synonymous. Specifically does not say 'the cause.' It says 'a cause,' meaning there may be more than one cause." *Id.* at 45.

20. The Court notes that there are 53 individuals with cancer, yet Dr. Dollinger has submitted specific causation opinions with regard to only 51 individuals. There is no specific causation opinion with regard to Gerald Molina or Russell Mutz. *See* Dollinger 2002 Deposition at 101–02 (acknowledging that he did not and was not planning to offer any testimony regarding the cause of Russell Mutz's Good Pasture Syndrome). Therefore, summary judgment is appropriate as to these Plaintiffs' claims because there is no evidence of specific causation.

pears to have based his causation opinion on both Crystal's total effective radiation dose of 10–26 mrem and her father Paul's dose of 461–1,693 mrem. *Id.* at 74.

With regard to two of the children, Dr. Dollinger's report indicates that he based his cancer causation opinion solely on parental exposure. Jose Hernandez IV was born in 1997 and was diagnosed with a brain tumor in 2001. Dr. Dollinger noted that the total effective radiation dose of his mother, Bridget Hernandez, was 4,489—11,547 mrem and "[w]ithin reasonable medical probability, the ionizing radiation resulting from the contamination acted as a carcinogen (a cause of cancer), and such exposure of this subject's mother to such ionizing radiation was a cause and a substantial contributing factor in the development of this subject's cancer." *Id.* at 54. Similarly, Thomas Molina was diagnosed with leukemia. Dr. Dollinger concluded that "[w]ithin reasonable medical probability, the ionizing radiation resulting from the contamination acted as a carcinogen (a cause of cancer), and such exposure of this subject's father [Gary Molina, whose total effective radiation dose was 4,875—11,237 mrem] to such ionizing radiation was a cause and a substantial contributing factor in the development of this subject's cancer." *Id.* at 59.

### The 2003 Report

Dr. Dollinger submitted a supplementary and rebuttal report in April 2003. It included an additional appendix that listed additional data on cancers from exposure to ionizing radiation, which he claims "further lists and documents the relationship of ionizing radiation exposure as a cause of various types of cancer, such as seen in these plaintiffs." Dollinger 2003 Report at 3. In the listing of materials reviewed in making his report, Dr. Dollinger added references to the "supplemental listing of cancers from exposures to ionizing radiation," an April 2003 study by Rothkamm et al. entitled "Evidence for a lack of DNA double-strand break repair in human cells exposed to very low x-ray doses," Resnikoff's April 2003 Supplementary and Rebuttal Report, and an additional forty-six articles. *Id.* at 14–17. The supplementary and rebuttal report also considers Resnikoff's April 2003 supplementary and rebuttal report, which addresses resuspension doses, fifty-year versus shorter time-period committed doses, and calculation of organ-specific doses. *Id.* Dr. Dollinger states that "[t]his new data, TEDE [total effective dose equivalent] and Organ Dose, should be used to replace the earlier data given and reproduced from my prior report of August 18, 2002.... [T]he new data of Resnikoff and Hinterman should be used in each plaintiff's case instead of the 'total effective radiation dose' values listed in the prior report." *Id.* at 3–4.

### Daubert hearing

Dr. Dollinger testified at his *Daubert* hearing on March 2, 2005. He again emphasized his reliance on the "stochastic" effects of ionizing radiation in cancer production and the importance of the linear no-threshold hypothesis, which he testified has now been validated. Much of the testimony at the hearing was the same as that presented at Dollinger's two depositions and in his reports and affidavit. However, Dr. Dollinger also set forth a new methodology he had developed for determining whether the exposure resulting from Defendants' conduct was a "predominant factor" (as opposed to merely "a" factor) in causing the Plaintiffs' cancers.

Dr. Dollinger acknowledged that he had previously declined to rank contributing factors by relative importance, but Plaintiffs' counsel asked him:

Q. However, if you have a situation, for example, where you know what the background level of radiation is and you know what the average dose is from

perhaps x-rays and you also know what the dietary contribution might be, but you also have an external source that is a multiple of all of those sources, can you make probabilistic statements about what sources are the most likely or most dominant that would contribute to mutations that ultimately lead to a cancer?

A. Yes. That would go to the stochastic principle, which I outlined or the model which I outlined earlier, that the higher the dose, the more the risk.[21]

Dr. Dollinger testified that, though he was "confident" that the exposure was a cause of the cancers, he "sought to consider whether [he] could further subdivide the group and [see whether] some of these in which radiation could be thought of as the predominant or principal cause, as compared to a cause." *Daubert* hearing at 314. Boiled down, Dr. Dollinger sought to compare the average organ dose for an individual, based on Dr. Resnikoff's calculations, with the natural background radiation rate to determine whether the exposure due to Defendants' activities was the predominant cause of a plaintiff's cancer. Dr. Dollinger testified that his first step was to select the mean organ dose because that number was "most likely to represent the true number." *Daubert* hearing at 313. He clarified that it seemed to be a "reasonable representation of the dose" and it would be hard to deny that was a valid number because although the high end of the range might be too high and the low end of the range might be too low, "you really can't argue that [the mean] in this case is not in the general vicinity of the dose." *Id.* Thus, he stated, in a range, "the average is most likely to represent the true number" and "represents the best estimate for purposes of thinking." *Id.*

The second step was to determine the background radiation for Karnes County,

which he did by asking Dr. Resnikoff. *Id.* at 314. The remainder is set forth as follows:

A. So I took that data of 250 millirem as being the average background radiation from all of the various sources, celestial and in the body, potassium 40, carbon 14, whatever. And I took that 250, and I said let's multiply it by four, make it four times greater.

Q. Four times greater than background?

A. Background. Certainly, if somebody was exposed to cancer—I'm sorry—radiation, of course, one develops cancer, exposed to radiation, and the extra radiation above background which, of course, increases the risk; whatever the risk of background is, if you get more radiation, you increase the risk. That's the stochastic model. So if it were four times greater, that is, 1,000 millirem as background in that area, it certainly must be the principal and predominant cause compared to the other sources. When I went through that analysis of the 49 people on these two pages in which we have an organ dose, 33 of the 49 had an average above 1,000. That's 67 percent or two-thirds of them—

THE COURT: Doctor, I am not sure I understand your basis for selecting four. Why four, rather than six, rather than ten, rather than two?

THE WITNESS: Thank you, Your Honor. I initially thought about selecting two or three, but the reason for selecting four, it is sort of arbitrary, in that I wanted to be sure I had a number high enough no one that could question it.

If I selected two or three, one might say: Well, there is some inherent uncer-

---

21. *Daubert* hearing at 285.

tainty about some of the numbers, similarly, like a few minutes ago I explained why I picked the average.

There is some uncertainty about every number, but four times the dose of radiation, I was sure that if I picked four times 250, or 1,000, I was absolutely sure that it wasn't 250; even with the inherent errors in measurement, you could not get back down to just background. It had to be above background, and most likely significantly above background, but I allowed room for the inherent error in the measurement, and Dr. Resnikoff's or anyone's calculations may not be exactly precise, but our best scientific estimates, but I wanted to allow that there could be no error in the estimation.

. . .

Q. Now, at background levels that you have described, there would be a certain number of mutations that would be attributable to ionizing radiation in a given population; is that correct?

A. Yes.

Q. And when you multiply the background level, let's say, by a factor of four, what are you doing in terms of the risk or the probability of increasing the number of mutations?

A. Again, according to the stochastic model, if the risk of a cancer mutation from background is a number X, it is four X, four times greater.

Q. And is that because of the linearity of the no-threshold model that has been empirically validated?

A. Absolutely, yes.

Q. And you feel confident that when you have persons, for example, in Karnes County that have exposures to the ionizing radiation as a result of living next to the haul routes, and perhaps as a result of being in the area, that those exposures will increase the frequency of mutations relative to what exists at the background level?

A. Yes.

Q. And from that, are you able to deduce that the most probable cause of the cancers for those persons who are at the 1,000–millirem level, external dose from ionizing radiation were more likely to develop their cancers as a result of the ionizing radiation, rather than other factors?

A. That is correct. I am absolutely sure that that dose over 1,000, that is the most likely cause.[22]

Dr. Dollinger continued:

A. . . . . Next, I considered the fact that there is another group of people who have more than background, but less than 1,000. And I considered that one of the pathways of thinking that has been used is doubling the risk of cancer from any cause, radiation being an example.

Well, if the risk of background is X and the risk of giving additional radiation is twice background, then you have doubled the risk. Whatever the risk background was, if you get twice as much as background, you have doubled the risk.

Well, the background is 250, and then you get 250 more from ionizing radiation, let's say from the contamination in this situation, then you have doubled the risk.

So I have gone through the same set of numbers, and these penciled—let me see if I can make the laser work. Yes. These lines right here are the second part of the analysis.

These represent people, represent people who have had at least 250 or more; in other words, these people have

22. *Daubert* hearing at 315–19.

at least twice the risk of getting cancer as a result of the radiation, because the background dose has been doubled.

Q. And when you double the background dose, do you double the risk in terms of increased number of mutations that may result in a manifested cancer?

A. Yes. That is again because of the linear relationship in the stochastic model. You double the number of ionizing radiation effects, and you double the risk of their causing cancer.

Q. Do you believe over the past few years the literature has evolved to the point where there is no longer any question about the validity of the linear no-threshold model? In other words, you can go below 5,000 millirems, which is the extent of resolution of epidemiological studies, and go down to zero, from the molecular biological experimentation that has been done to date?

A. No question about the validity of those studies.

Q. And are these articles appearing in very, very recent journals, 2004, 2005?

A. Yes. And 2003 as well.

Q. And as a result of this recent literature, has your thinking evolved where you are now able to define more probable causes than perhaps you were at the time when you gave your deposition when you indicated that as long as there was an excess above background, it would be a substantial contributing factor?

A. Yes. I might—if it would be okay to finish up the last part of this discussion. If we take the people, as I told you earlier, the people over 1,000, or two-thirds, 33 out of 49 or 67 percent, if we add the people over 250, which is at least doubling the dose and, therefore, doubling the risk, 41 of 49 apply, or 84 percent. There are still eight people who have doses below 250. Therefore, it

did not—the external radiation did not at least double their risk.

THE COURT: I am sorry, Doctor. Maybe I am confused. I read your deposition to say anything above background was the cause.

THE WITNESS: That is correct.

THE COURT: And then I thought I heard you say now, no, I am using a four-times background. And then now am I hearing a third model?

THE WITNESS: No, Your Honor. You are hearing a refinement of my thinking.

THE COURT: Okay.

THE WITNESS: I will be happy to try to—

THE COURT: Rephrase for me, restate what your position is.

THE WITNESS: My position is that any dose above background is a substantial cause and a substantial contributing factor, but previously, it was not—it felt reasonable to be able to rank them in order of the priority. Which is the most likely cause, if there is a likely cause? If we can determine that, how would we do that?

Subsequently, in the face of all of the new literature and science that has been available, the linear model, the discussions of that, especially at low dose, that over 1,000, which can certainly, definitely not merge with 250, it is clear that radiation, in addition to being a cause, is the principal cause.

THE COURT: And you say with a reasonable degree of medical certainty, you are saying that in those individuals, they receive cancer as a result of this radiation—or uranium dust. Now, are you saying now with a reasonable degree of medical certainty for everybody with less than 1,000?

THE WITNESS: No. Not necessarily, Your Honor. Between 250 and 1,000 I am saying, yes, with reasonable medical certainty, because it doubles the risk, because you doubled the dose. Below 250, those nine people, I am not able to say that radiation is the predominant cause.

THE COURT: Well, doubling the dose, is doubling the dose 500?

THE WITNESS: Doubling the dose is adding 250 more.

THE COURT: Right. So if I understood things right, 250 to 300 is background for that area, correct?

THE WITNESS: My understanding is 250 is the closer estimate of that.

THE COURT: Okay.

THE WITNESS: Yes.

THE COURT: Are you saying with a reasonable degree of medical certainty that those individuals with exposures of 250 to 500 receive their cancer as a result of this ore dust?

THE WITNESS: Yes. But I am not able to say below 250, because we have not yet doubled the dose. I believe it was a contributing factor, but I can't say that that was the predominant or principal one. It may have been, but I cannot say that with reasonable medical probability. That is consistent with my prior testimony.[23]

*Defendants' challenges to Dr. Dollinger*

Defendants move to exclude Dr. Dollinger's testimony as unreliable. They contend that he relies on a series of unsupportable assumptions: 1) that exposure to uranium and its decay products at any dose above background levels is a risk factor for nearly all types of cancer; 2) that any risk factor in an individual (e.g., smoking, heredity, diet, or chemical exposure) is necessarily a substantial contributing cause of cancer that develops in that individual; and (3) all of the Plaintiffs were exposed to levels of uranium and its decay products in excess of background, and therefore such exposure was a substantial contributing cause of their cancers. They argue that Dollinger's speculations do not satisfy Rule 702 and *Daubert* and that his approach violates every federal and Texas standard for causation testimony because Dollinger lacks epidemiological evidence to support his opinions, does not require proof of general causation, does not consider each Plaintiff's dose, and does not attempt to rule out other plausible causes.

Defendants contend that Dr. Dollinger's reliance on Resnikoff's calculations warrants his exclusion because Dr. Dollinger has no scientific basis for his reliance. At deposition, Dr. Dollinger admitted that he lacked the expertise to choose between Resnikoff's dose calculations and those of Defendant's expert Ian Hamilton, yet he chooses Resnikoff's. Defendants further argue that Dr. Dollinger's specific causation theory is not generally accepted in the scientific community. According to Defendants, Dr. Dollinger cannot identify a single scientist, including himself, who has ever published the theory that exposure to uranium and its decay products is even associated with, much less a risk factor for, the approximately 18 different cancers in this case. To the contrary, numerous established scientific organizations have evaluated the relevant scientific evidence and concluded that it does not support the opinion that exposure to uranium and its decay products causes cancer.

Defendants further contend that Dr. Dollinger's opinions regarding the epidemiological evidence are inadmissible and that epidemiological evidence of causation is essential to his opinions as a matter of both science and law. Because medical

---

23. *Daubert* hearing at 319–23.

science does not have direct evidence that a specific cancer was caused by a specific radiation exposure, experts seeking to link specific cancers to specific ionizing radiation exposures must rely primarily on indirect epidemiological evidence. Dr. Dollinger agrees that epidemiological evidence is the best evidence of causation. Yet Dr. Dollinger fails to offer any supporting epidemiological evidence, and his own testimony demonstrates that he lacks expertise to evaluate the epidemiological evidence.

Defendants further assert that Dr. Dollinger did not follow his own methodology for applying the epidemiological data to assess causation. Defendants provide deposition testimony from Dollinger in the prior *Adams* case [24] in which Dr. Dollinger testified that, if the radiation dose is below 10,000 millirems (10 rem), it cannot be invoked automatically or by general consensus as a substantial contributing factor of the cause of cancer. Dr. Dollinger disagreed with that statement in this litigation, but did not provide an explanation other than speculation that his prior testimony "likely was in relation to a statutory or legal requirement that in that venue there may have been a requirement for that dose." However, the *Adams* case was pending in Texas and involved the same alleged exposures as in this case. Thus, Dr. Dollinger's rejection of his own prior causation criteria should preclude his testimony because it demonstrates the lack of any reliable scientific methodology underlying his opinion. They also note that Dr. Clapp, at his deposition, agreed that it would be hard to separate out the contribution in radiation dose and other factors below 10,000 millirems.

Next, Defendants assert that Dr. Dollinger's testimony should be excluded because he failed to read the relevant epidemiological studies prior to forming his opinions and because he concedes that the epidemiological evidence fails to support his opinions. Although Dr. Dollinger agreed that epidemiological studies involving uranium miners and millers would have been helpful, he did not discuss them in either of his reports. He also did not attempt to collect all of the studies of people occupationally exposed to uranium and its daughter products, nor did he read the epidemiologic studies of Karnes County,[25] the Royal Society's analysis of the epidemiologic studies of uranium workers, IARC's 2001 monograph on ionizing radiation, or Darby's combined analysis of the studies of underground uranium miners. Further, Dr. Dollinger concedes that the epidemiologic literature he did read fails to support his opinion that exposure to uranium and its decay products causes all types of cancer. Dr. Dollinger's admissions make it clear that his opinions are based on his own unsubstantiated hypothesis, not on reliable scientific evidence or methodology.

Next, Defendants challenge Dr. Dollinger's ability to give a specific causation opinion in the absence of dosage information. In his deposition, he stated that "dose would not matter." For example, he would assign ionizing radiation as a cause of cancer whether a plaintiff received a dose of 3 millirems or 50 rems (50,000

---

**24.** *Adams* is one of two similar cases that were previously brought against these same defendants, but were dismissed for failure to comply with the district court's order. The dismissals were affirmed on appeal. *Acuna v. Brown & Root, Inc.*, 200 F.3d 335 (5th Cir. 2000).

**25.** Defendants refer to a study by one of their experts, Dr. John Boice, which the Court is not considering given Plaintiffs' pending *Daubert* challenge to Dr. Boice and his study. Another study was conducted by the Texas Department of Health and was summarized in a 1989 report; it reported no excess mortality for lung, brain, and bone cancers and leukemia in Karnes County.

millirems). Although it is unimportant to Dr. Dollinger, dose is relevant for an admissible causation opinion. Under established Fifth Circuit precedent, "[s]cientific knowledge of the harmful level of exposure to [an agent], plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiff's burden in a toxic tort case." *Allen*, 102 F.3d at 199. Because he rejects the importance of dose and fails to consider the dose information in forming his opinions, Dr. Dollinger's testimony is inadmissible. Dr. Dollinger also lacks scientific information defining any allegedly harmful level of exposure. He can cite no studies reporting that ionizing radiation increases the risk of any of the forms of cancer in this case at the doses alleged by Plaintiff's dosage witness. Defendants argue that, had he performed the necessary research, Dr. Dollinger would have discovered that there is no scientific support for the idea that uranium and its decay products cause any form of cancer at the doses alleged in this case.

Further, Defendants contend that the epidemiologic studies cited by Dr. Dollinger demonstrate the scientific unreliability of failing to consider dose. To support his opinion that exposure to uranium caused Plaintiff Elma Cortez's bladder cancer, Dr. Dollinger cites a study of women given x-ray therapy to induce menopause as a treatment for excessive uterine bleeding. The dose to the bladder of the women was 500,000 mrems. By contrast, Dr. Resnikoff's estimated dose was between 34 and 331 rems, over 1000 times less than the dose in the study. Moreover, in the study, the authors reported the incidence of cancers for lightly or very lightly irradiated sites, such as the lungs and the breast, found no increase of cancers. The lightly irradiated organs received a dose of approximately 4000 mrems, still over 10 times higher than Cortez's highest possible dose of 331 mrems. In addition, the high-est dose to the breast in any Plaintiff calculated by Resnikoff was 1,935 mrems, less than half the dose in the study. Dollinger's reliance on studies involving high doses of radiation from x-rays and other non-uranium sources of ionizing radiation does not constitute a scientifically reliable methodology for assessing whether the Plaintiffs' cancers were caused by exposure to uranium and its decay products.

Defendants attack Dr. Dollinger's reliance on the linear no-threshold model. Defendants contend that the linear no-threshold model provides neither reliable nor relevant support for a causation opinion because it is a prophylactic regulatory model that speaks only to hypothetical possibilities. Dollinger agreed that the model is only a hypothesis and admitted that thresholds "may exist in the low-dose domains." Dr. Dollinger also admitted that the model suggests only the possibility of a cancer process. He admitted that the mere fact that someone is exposed to ionizing radiation above background does not mean that the person is going to develop cancer. Thus, according to his own testimony, his linear no-threshold model cannot support a more-likely-than-not opinion in a legal proceeding. Because he offered no scientific support for his theory that exposure to ionizing radiation at any level would cause cancer, his causation testimony should be excluded.

Defendants further assert that Dr. Dollinger's opinion fails the requirement that an expert address and attempt to exclude other plausible alternative causes. Dollinger admitted that each of the Plaintiffs' cancers could have numerous causes, yet he also admitted that he made no effort to determine the relative contribution to the cancer of each of his alleged multiple causes. For example, in his book Dr. Dollinger states that the most common risk factor for bladder cancer is cigarette smoking and concludes that "smoking may

be responsible for 50 percent of bladder cancers in men and 40 percent in women." Elma Cortez smoked 3–4 cigarettes per day, yet Dr. Dollinger offers no scientific basis for excluding smoking as the cause of her cancer. This failure is particularly troubling given Dr. Dollinger's admission that no peer-reviewed literature indicates that exposure to uranium and its progeny causes bladder cancer.

Last, Defendants contend that Dr. Dollinger admitted that he is not an expert in whether ionizing radiation can cause abnormalities to pass to offspring and that he has performed no research into these issues. Even if qualified, Dr. Dollinger has no scientific basis for any specific causation opinion relating to the various second-generation claims and admitted at his deposition that he had no scientific data to support his claim. Thus, Defendants argue that Plaintiffs cannot sustain their burden of establishing that Dr. Dollinger's second-generation opinions meet the scientific validity standards of Rule 702.

### Plaintiffs' Response

Plaintiffs respond that Dr. Dollinger used standard and generally accepted medical methodologies to prove that Defendants caused the Plaintiffs' cancers using the extensive body of literature on ionizing radiation. This conclusion is supported by Congressional Acts recognizing that ionizing radiation causes the very cancers that Plaintiffs have. Defendants mislead the Court into believing there is a lack of scientific literature by attempting to limit the field to only their defined subset of inconclusive studies rather than the massive body of scientific literature upon which Plaintiffs' experts rely.

Plaintiffs assert that the basis for Dollinger's specific causation testimony is the differential diagnosis he performed on the Plaintiffs. Differential diagnosis is considered a near universal technique to determine the specific cause of disease, defined as a physician's consideration of alternative diagnoses that may explain a patient's condition. Reference Manual at 434. The differential diagnosis completed by Dr. Dollinger in this case included a comprehensive review of each Plaintiff's medical records, taking a complete medical history, a confirmation of his understanding of each Plaintiff's exposure scenario, and personal physical examination or interview with next-of-kin. His methods are reliable because they are the same methods used in the medical community to assess cancer causation. General acceptance within the scientific community is the hallmark of reliability and thus his method is per se reliable. Dr. Dollinger's reliance on independent studies that support the proposition that ionizing radiation causes the cancers involved here means his methodology has been tested. The literature relied on in evaluating the types of cancer caused by radiation are a significant part of the basis for his opinions. His conclusions are specifically supported by Congress, which recognized that ionizing radiation and/or aboveground uranium mining and transportation causes the cancers suffered by Plaintiffs. Congress reviewed the data from the President's Advisory Committee on Human Radiation Experiments and the Committee on the Biological Effects of Ionizing Radiation (BEIR) to reach this conclusion.[26] This Congressional finding

---

**26.** Plaintiffs cite Pub.L. 106–245 § 2, July 10, 2000 and the Radiation Exposure Compensation Act, both codified at 42 U.S.C. § 2210 note. The Court notes that, in the note, under the section dealing with "claims relating to atmospheric nuclear testing," affected persons may recover if they develop leukemia, multiple myeloma, lymphomas (other than Hodgkin's disease), and primary cancer of the: thyroid, male or female breast; esophagus, stomach, pharynx, small intestine, pancreas, bile ducts, gall bladder, salivary gland, urinary bladder, brain, colon, ovary, liver, or

supports judicial notice as to general causation of the cancers recognized therein.

In addition, causation of bone cancers is not in real dispute because Defendant's expert Dr. Ettinger admits that ionizing radiation is the only known cause of bone cancer and identifies the general causative nature of ionizing radiation for lung cancer, stomach cancer, thyroid cancer, leukemia, and multiple myeloma.

Plaintiffs further assert that Dr. Dollinger is only required under Texas substantive law to eliminate other causes that can be excluded and that "it is not necessary to exclude all other possible causes in order to prove proximate causation as there can be more than one proximate cause." Most cancers result from an interaction between genetic and environmental factors. Multifactorial causes of disease, including radiation induced cancer, is the norm and the Defendants' argument that all causes of disease other than the radiation generated by the Defendants must be ruled out is inconsistent with modern principles of causality. Further, Plaintiffs assert, Defendants' attempt to confuse the record with inconclusive studies of selected groups of uranium miners is irrelevant to any causation analysis—the lack of an association in multiple epidemiology studies means nothing more than they are inconclusive; it does not mean that causation does not exist.

### Defendants' Reply

Defendants reply that, where direct evidence of causation is lacking, experts seeking to link specific cancers to specific radiation exposures must rely primarily on indirect epidemiological evidence. The fact that Dr. Dollinger is an oncologist with a medical degree from Yale does not make him qualified to give novel specific causation opinions in a situation where, as he admits, there can be no direct evidence of specific causation. Because epidemiology is so important where direct evidence is lacking, "[s]imply having a medical degree or training is insufficient expertise to establish causation which hinges on factors such as 'dosage, duration of dosage a latency periods'" where "these parameters 'have been established and defined through epidemiological studies.'" *Sutera v. Perrier Group of Am., Inc.*, 986 F.Supp. 655, 667 (D.Mass.1997). The ability to diagnose and treat a disease is substantially different from the expertise required to assess its genesis to a reasonable degree of scientific certainty. Dr. Dollinger has considerable expertise in diagnosing and treating cancer, but has no expertise in epidemiology, toxicology, biostatistics, or risk-assessment, and has not done any original research or published any papers about ionizing radiation, its properties, or its carcinogenic effects.

In addition, Dr. Dollinger cannot give his proffered specific causation opinions because he has no scientifically valid proof of general causation. Dr. Dollinger does not purport to rely on Dr. Clapp's general causation opinion, but attempts to do it all by himself despite his lack of expertise in epidemiology.[27] Ignoring the relevant exposure to uranium ore and its byproducts,

lung. However, the section dealing with "claims relating to uranium mining" permits uranium mine or mill employees to receive money for a claim only if they develop lung cancer or a nonmalignant respiratory disease or renal cancers and other chronic renal disease including nephritis and kidney tubal tissue injury.

**27.** The Court notes that Dr. Dollinger did testify at the *Daubert* hearing that he in fact relied on Dr. Clapp's conclusions regarding general causation. *Daubert* hearing at 286. However, there is no indication in his Reports that he did so, and although he listed Dr. Resnikoff's reports as references, he did not reference Dr. Clapp's reports. It appears to be more accurate that Dr. Dollinger attempted to establish general causation (or, at least, to "rule in" potential radiation-cancer relationships) through his own review of the literature, and only tangentially relied on Dr. Clapp's conclusions, if at all.

Dr. Dollinger continues to put forward a general causation opinion based on "ionizing radiation" in general. However, a generic opinion that ionizing radiation causes cancer is irrelevant here because it does not fit the facts of this case. Dr. Dollinger has admitted that the type of radionuclide matters for cancer causation. Moreover, Dr. Dollinger's affidavit provides no scientific article citations and no explanation of how he bridges the analytical gap from ionizing radiation in general to conclude that exposure to uranium ore and its byproducts can cause all of the cancers in this case. In addition, far from being inconclusive, the uranium epidemiology studies were sufficient for at least four established scientific organizations to opine that there is no basis to conclude that uranium radiation exposure causes cancer. These studies mean that there is no scientifically valid basis for Plaintiffs' experts to draw a contrary affirmative causation opinion. *Allen,* 102 F.3d at 197; *see also Allison v. McGhan Med. Corp.,* 184 F.3d 1300, 1314 (11th Cir.1999).

Last, Dr. Dollinger's specific causation opinions are irrelevant and inadmissible because he has failed to identify exposure to uranium and its byproducts as the most likely cause of any Plaintiff's injury. Although he claims to follow a differential diagnosis methodology, Dr. Dollinger in fact has not applied that method in this case in that he has failed to adequately rule out other causes. Differential diagnosis is used to identify the most likely cause of a set of signs and symptoms from a list of possible causes. An expert who fails to scientifically rule out or quantify alleged risk factors to arrive at the most likely causes offers a specific causation opinion that is not relevant because it is nothing more than pure speculation. *Coleman v. Danek Med., Inc.,* 43 F.Supp.2d 637, 650 n. 23 (S.D.Miss.1999). A specific causation expert cannot merely assert that every risk factor is a cause, but must provide a

scientific basis to identify the most likely cause. *Newton v. Roche Labs., Inc.,* 243 F.Supp.2d 672, 683 (W.D.Tex.2002). Far from simply neglecting to eliminate other possible causes, Dr. Dollinger affirmatively refuses to do so, claiming that "one identifies several risk factors/causes, and they are all causes and substantial contributing factors." Plaintiffs wrongly claim that Texas law does not require Dr. Dollinger to rule out other causes, citing generic proximate cause cases that have nothing to do with expert testimony or differential diagnosis. Consistent with federal law, however, Texas substantive law states that a cause becomes "probable" only when "in the absence of other reasonable causal explanations it becomes more likely than not that the injury was a result." *Parker v. Employers Mut. Liab. Ins. Co.,* 440 S.W.2d 43, 47 (Tex.1969). In the specific context of medical causation testimony, the Texas Supreme Court has interpreted *Parker* to require that "if there are other plausible causes of the injury or condition that could be negated, the plaintiff must offer evidence excluding those causes with reasonable certainty." *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 720 (Tex.1997). Because Dr. Dollinger refuses to rule out or otherwise quantify his alleged risk factors for each Plaintiff's cancer, his specific causation opinions are neither reliable as a matter of medical science nor relevant as a matter of federal and Texas law.

### Analysis

According to the Reference Manual, determining external causation occurs in a stepwise fashion. Reference Manual at 468. In the first step, the physician must establish the characteristics of the medical condition. Second, he or she carefully defines the nature and amount of the environmental exposure. This involves assessing four "cardinal" pieces of exposure information: (1) the material or agent in the environmental exposure should be

identified; (2) the magnitude or concentration of an exposure should be estimated, including use of clinical inference; (3) the temporal aspects of the exposure should be determined—whether the exposure was short-term and lasted a few minutes, days, weeks, or months, or was long-term and lasted for years (similarly, the latency between exposure and disease onset is often critical); and (4) if possible, the impact on disease or symptoms should be defined. The third step is to demonstrate that the medical and scientific literature provides evidence that in some circumstances the exposure under consideration can cause the outcome under consideration.[28] This step is synonymous with establishment of general causation. As part of this step, the clinician attempts to establish the relationship between dose and response, including whether a threshold exists, ultimately defining the clinical toxicology of the exposure. The physician should review epidemiological and toxicology studies and "should be guided by the methods set forth in the Reference Guides on Epidemiology and Toxicology in evaluating this literature and its relevance to the patient's exposure and condition." *Id.* at 474.

The fourth step is to apply this general knowledge to the specific circumstances of the case at hand, incorporating the specifics of exposure, mitigating or exacerbating influences, individual susceptibilities, competing or synergistic causes, and any other relevant data. The Manual notes that some conditions may have multiple contributing factors, and that some agents have been found to interact in a synergistic manner or to contribute in an incremental

fashion to a disease, and thus the common statement that "alternative causes of disease must be ruled out" before causation is attributed can be more accurately refined to say that "the role of other causes must be adequately considered." *Id.* at 476.

In a footnote, the Reference Manual notes:

Many cases involving issues of external causation have involved witnesses who testify to having arrived at an opinion on cause through a process of ruling out or eliminating other causes, a process frequently referred to by the courts and witnesses as 'differential diagnosis' or 'differential etiology'.... Not infrequently, this form of testimony is implicitly or explicitly offered to satisfy the applicable burden of proof on causation. The relationship between the 'more probable than not burden of proof' and 'differential diagnosis' was discussed in *Cavallo v. Star Enterprise,* 892 F.Supp. 756 (E.D.Va.1995), *aff'd in part, rev'd in part,* 100 F.3d 1150 (4th Cir.1996), *cert. denied,* 522 U.S. 1044, 118 S.Ct. 684, 139 L.Ed.2d 631 (1998), a case in which the witness opined on whether a spill of aircraft fuel caused the plaintiff's rash. The court explained, "The process of differential diagnosis is undoubtedly important to the question of 'specific causation.' If other possible causes of an injury cannot be ruled out, or at least the probability of their contribution to causation minimized, then the 'more likely than not' threshold for proving causation may not be met."

*Id.* at 470 n. 112.

The Reference Manual identifies one of the problems present in this case: many

---

28. The Reference Manual states that courts differ on the question of whether the witness giving an opinion on causation must support his or her opinion with references to medical or scientific studies supporting a causal link between the toxic exposure and the plaintiff's

disease, and notes that the Fifth Circuit, in *Moore v. Ashland Chemical,* 151 F.3d 269, 277–78 (5th Cir.1998) (en banc), has answered this question "in the affirmative." Reference Manual at 473 n. 126.

conditions resulting from toxic exposures are similar or identical in clinical manifestations to conditions arising from nontoxic causes. Reference Manual at 470. Thus, "[p]hysicians rely on their training and expertise as clinicians and scientists when considering the medical and scientific literature as well as information about a patient's condition to best determine causality in a particular patient. Definitive tests for causality are actually rare, and physicians must almost always use an element of judgment in determining the relationship between exposure and disease in a given patient." *Id.* The Manual also notes that physicians usually attempt to determine through differential diagnosis the best explanation for a person's symptoms, but the specific contribution of environmental or workplace factors is not necessarily assessed as part of clinical care since it does not affect diagnosis, treatment, and prognosis. Thus, "[t]he key factor for the courts to recognize is that, while similar underlying reasoning is used in determination of both internal and external causation, and physicians routinely make limited determinations of external causation, many of the facts relevant to a determination of external causation rely on a body of scientific literature that is not routinely used by treating physicians. As a corollary, an expert's opinion on diagnosis and his or her opinion on external causation should generally be assessed separately, since the bases for such opinions are often quite different." *Id.* at 471–72.

■ Plaintiffs rely heavily upon the fact that Dr. Dollinger performed a differential diagnosis, arguing that his use of such a well-used method renders his method per se reliable. Courts accept the general validity of the differential diagnosis technique. Sanders & Machal–Fulks, *The Ad-*

*missibility of Differential Diagnosis Testimony to Prove Causation in Toxic Tort Cases: The Interplay of Adjective and Substantive Law,* 64 LAW & CONTEMP. PROBS. 107, 120 (2001). However, an expert's assurances that he has utilized generally accepted scientific methodology is insufficient. *Moore,* 151 F.3d at 276. Similarly, the Texas Supreme Court has stated that "an expert's assertion that a physical examination confirmed causation should not be accepted at face value." *Havner,* 953 S.W.2d at 720. Thus, courts may refuse to admit a differential diagnosis on the basis of the quality of the expert analysis. Sanders, *supra,* at 120.

Dr. Dollinger testified that he used the differential diagnosis methodology to determine specific causation:

Q. And in the process of doing your specific causation analysis, did you employ a principle known as either differential diagnosis or differential exclusion?

A. Yes.

Q. And can you explain what that is, please?

A. Yes. Differential diagnosis is the standard, universally accepted, universally performed method that physicians use when a patient has a complaint or abnormality and the need is to find out what the diagnosis is.

The doctor considers a series of different diagnostic possibilities, weights the advantages and disadvantages of each one, in terms of its contribution, and then selects one—or sometimes more than one—most likely diagnosis. It is called a differential diagnosis. And in this case, since we are interested in ruling in causes that are valid, perhaps if we are interested in ruling out causes, we could say differential exclusion. But the mental process and the scientific process and the pathway is the same as every doctor in the world uses when he or she looks at a patient to determine

what the most likely answer is to the problem that presents.[29]

In his deposition, he described his method as follows:

Q. What analytical method or methods did you use to arrive at your causation opinions in this case?

A. These are also described in my report. Essentially I used a principle in medical practice called differential diagnosis. One examines the subject. Specifically, he examines their medical history and their personal history and their lifestyle. One reviews the medical records and other records that may be available regarding the type of cancer, ascertains that the type of cancer is known and defined.

Then one determines the—or I determine the various possible causes or contributing factors for that type of cancer. Smoking and lung cancer would be a good example, in addition to ionizing radiation.

But one considers all of the potential causes and substantial contributing factors in the production of that type of cancer and determines if the subject has been exposed to or participated in various exposures, various contaminations, various lifestyle aspects, various habits, various genetic influences—some cancers are hereditary—and whatever other causes may be known in the medical world for each type of cancer.

And then after this process of differential diagnosis, one can make a listing of the various causes and substantial contributing factors for each person's cancer.[30]

Dr. Dollinger developed an algorithm to exemplify his differential diagnosis methodology, and stated that, as part of that algorithm, "we identify a list of causes. We consider whether it is likely or unlikely, and then we determine what the risk is that the cancer is due to those various causes." *Daubert* hearing at 290. When the Court questioned counsel regarding whether he was "going to explore that diagram further about weighing the clinical factors and how he quantifies the risk," counsel replied that that would be developed "when [he got] to the specific plaintiffs." *Daubert* hearing at 291. However, the Court is not aware that, other than the new methodology discussed at the hearing, any evidence was admitted in which Dr. Dollinger actually attempted to determine any specific risk associated with the various possible causes.[31] Rather, as the

29. *Daubert* hearing at 287.

30. Dollinger 2003 Deposition at 30–31.

31. With regard to Plaintiffs with lung cancer, the Court asked "And how did you weigh them? For example, the individuals who were diagnosed with lung cancers, and I think the testimony here was virtually all of them were smokers, how did you weigh that to determine that the irradiated dust was the cause?" Dr. Dollinger replied:

First of all, it is clear that there were two causes in smokers; at least two, I should say, the background environmental radiation and the smoking history. I'm sorry. Three causes. And the cause from the exposure here from the industry. And in weighing the three causes, to answer your question, I consider the fact of the amount of smoking they did. For example, the so-called 20–pack year is thought to be a threshold. Well, smokers who smoke ten-pack years also get lung cancer. It is just less likely. People who smoked 40–pack years, it may be more likely. But still, the minority of smokers develop lung cancer, regardless of their smoking history. Therefore, if you smoke, you can say you are likely to get lung cancer, but on the basis of probability, since 51 percent of people that smoke do not get lung cancer, smokers are not likely to get lung cancer. They are simply more likely than those who don't smoke.

*Daubert* hearing at 385–86. The Court fails to see how Dr. Dollinger's response exemplifies

Court sees it, Dr. Dollinger's expert opinion boils down to a conclusion that, once a person develops cancer, all possible causes of Plaintiffs' cancers (in other words, all possible causes that may reasonably be ruled in as a cause of a particular Plaintiff's cancer) are in fact causes, and are substantial contributing factors, in the particular Plaintiff's cancer development.

Dr. Dollinger repeatedly stated that he was not ranking the contributing factors by relative importance:

A. I am not ranking contributing factors by relative importance, that is, lesser or substantial, so I have listed all the contributing factors which I felt to be valid.

Q. So it would be fair to say that if you identify a factor as a contributing factor, you have concluded that it is a substantial contributing factor?

A. Yes.

Q. And you do not distinguish between if there are multiple, in your view, substantial contributing factors, you have not made any effort to determine the relative contribution to the cancer of each of these multiple causes; correct?

A. Yes.[32]

Rather, Dr. Dollinger's methodology appears to consist of determining what risk factors were present for a given individual (through medical histories and interviews), determining whether the Plaintiff's particular type of cancer corresponds to the risk factor based on his review of the epidemiological and scientific literature, and then concluding that any cause that could have

been a cause of this Plaintiff's cancer based on the available information was in fact a cause and a substantial contributing factor:

Q. If at the same time—so the fact— the presence of a risk factor in a person who develops cancer in and of itself to you means that that risk factor is a cause of the cancer?

A. Yes. Again, implying that the cancer corresponds in type to the risk factor.[33]

. . .

Q. Now, you included background radiation and x-rays as substantial contributing factors of the plaintiffs' cancers in this case, because you believe that the presence of a risk factor in a person who develops cancer, in and of itself, means that that risk factor is a cause of the cancer, right?

A. Correct.[34]

To reach this conclusion, Dr. Dollinger relies on several facts. First, he notes that "ionizing radiation from various sources still has the same ability to produce genetic damage and mutations, and such biological effects do not depend per se on the source of such radiation." Dollinger 2002 Report at 15. He asserts that the linear no-threshold model is valid and that even the lowest possible dose of one track of radiation may alter a cell and lead to cancer. And, under the stochastic model, the cancer is independent of the dose. He then concludes that, because cancer did in fact develop in these Plaintiffs, muta-

a weighing of the three asserted causes, unless he meant to say that he discounted smoking as the sole cause because smokers are not likely to get cancer. But that does not answer the question of whether the smoking was weighed more or less heavily in comparison to the other two asserted causes. In any event, it appears to the Court that Dr. Dollinger did not in fact "weigh" the causes relative to each other (and his testimony supports this

conclusion), but rather that he "weighed" potential causes in the sense of determining whether they were a possible cause, and, if so, he concluded they were in fact a cause.

32. Dollinger 2002 Deposition at 240–41.

33. Dollinger 2002 Deposition at 511–12.

34. *Daubert* hearing at 337.

tions did occur, and thus all possible causes of the cancer were in fact causes. This reasoning is evident in his report:

Specifically, for those individuals who do develop cancer, the ionizing radiation resulting from the environmental contamination was a substantial contributing factor and a cause of the cancer which developed. The increase in risk of each exposed individual increases linearly with the increase in does. For each individual, the development of cancer is an "all or nothing" phenomenon. For each exposed individual who did develop cancer, the risk for that person was 100%.[35]

And he further testified to this effect at his deposition:

A. Well, if there are multiple—more than one specifically causative factors or causes, each of them was a cause and a substantial contributing factor. Whether they were additive or synergistic is not often determinable, and does not matter to me if both were present and both were causes. Whether one produced one mutation or two or six or eight, and the other produced one or two or six or eight is not known and is not particularly relevant. They simply were a part of the pathway in the normal course of events for the mutation to occur as a result of one or more causes that produced the mutations.

Q. Doctor, what is it that you know or think you know about what happens within the cells in an organ that becomes cancerous that leads you to conclude, as you testified earlier, that even 1 millirem of ionizing radiation above background will be—will be a significant contributing factor and a cause?

A. It's clear, as I've already testified, that the minimal radiation dose, which is one hit or one alpha particle in the specific experiments which have been conducted, does produce a genetic change [or] mutation in one cell. Since cancer is a clonal process which begins in one cell, therefore, the smallest amount of radiation, one mutational event caused by one ionizing event is sufficient to initiate the process which causes cancer. It may be less likely than a hundred or a thousand or a million ionizing events, but it's still the basis for my opinion that one cell does begin all cancers, and a single radiation track is sufficient to produce the mutation that causes the first cell to become cancerous, or is a step in the process of the first cell becoming cancerous.

Q. Wouldn't it be accurate to say that a single event from the ionizing radiation could start in motion a chain that could result in a cancer, but it doesn't necessarily mean it will; isn't that right?

A. I've already answered that twice, and I've already stated in agreement with your question that most of the changes are never noted. They cause harmless effects; for example, on water, notwithstanding that free radicals may be produced also from ionizing water, which may themselves produce genetic damage. Some radiation effects produce changes which are trivial and not noted, some produce other diseases and some produce cancers. *But these subjects all developed cancers, so the end result is known. We are not considering persons who had no change whatsoever from the ionizing radiation.*[36]

In addition, not only was every possible cause (including background radiation) a cause, it was also a but-for cause. *See, e.g.,* Dollinger 2002 Deposition at 112 ("Q.

---

**35.** Dollinger 2002 Report at 29.

**36.** Dollinger 2002 Deposition at 97–99 (emphasis added).

If she had not received the dose that—from background that you assume she received in this situation, would she have contracted the breast cancer? A. No.").

Dr. Dollinger's "differential diagnosis" is not the typical methodology employed by doctors to diagnose a patient.[37] A differential "diagnosis" in the causation context involves first "ruling in" the potential causes for a patient's condition to a list of possible causes and second involves a "ruling out" process in which one attempts to narrow down the possible causes to the most likely cause or causes. Dr. Dollinger's methodology, on the other hand, involves taking a diagnosed condition—cancer—finding all the possible causes of that person's cancer from the universe of potential causes, and declaring all possible causes to be actual causes and but-for causes. This is a prime example of false-cause reasoning. Simply because each of the possible causes preceded the cancer and therefore could have caused the cancer does not mean that they did cause the cancer. It is possible that all of the possible causes contributed or that only some did. In fact, given that Dr. Dollinger does not appear to consider the fact that some cancers are due to unknown origins,[38] it is possible that none of the possible causes he lists was an actual cause. The fact that exposure to ionizing radiation from uranium may be a risk factor for cancer does not make it an actual cause simply because cancer developed.

Moreover, Dr. Dollinger admitted that his conclusions and methodology cannot be tested.[39] He also testified that he has not published in the peer-reviewed scientific literature his theory that exposure to ionizing radiation from the uranium ore could have caused all the cancers the Plaintiffs have experienced.[40] Further, although the differential diagnosis technique is well accepted and certain of the basic facts upon which Dr. Dollinger relies (such as the stochastic effects of radiation in the cancer context) are undisputed, Dr. Dollinger's particular application of the differential diagnosis to conclude that all possible causes are causes does not appear to have gained general acceptance in the medical and scientific communities.

Dr. Dollinger acknowledged that, at this time, it is impossible to determine the relative contribution, if any, of various carcinogenic sources to the development of a particular plaintiff's cancer:

Q. Is there a way of actually isolating out each contribution of ionizing radiation from a multitude of sources, from many different sources, that lead to mutations?

A. No. Because this effect is on a microscopic level inside the nucleus, the center part of a cell where the DNA is, the chromosomes. And all we know is—in fact, we don't know, at the moment the mutation occurs, we don't know that the mutation occurred at that moment. Something did happen inside the DNA, a series of five or ten or fifteen or 20 mutations, and that's usually the number

---

**37.** In fact, differential diagnosis is a term more appropriately used to describe the traditional role of doctors in determining a diagnosis for a patient's symptoms, rather than determining a cause of a plaintiff's cancer. Dr. Dollinger testified that the only time he has drawn a conclusion that a particular person had cancer because they were exposed to something other than background radiation is in the litigation context as an expert witness;

with the exception of a U2 pilot, he had not done so in his private medical practice.

**38.** Dr. Dollinger agreed at his deposition that "there are many causes of cancer, some of them known and some of them unknown." Dollinger 2003 Deposition at 510.

**39.** Dollinger 2002 Deposition at 334–35.

**40.** Dollinger 2003 Deposition at 527–28.

considered to be required to produce a cancer cell. When the last one is produced, and it finally does form a cancer cell, that cell is still invisible. It requires it to be divided to form two, to make four, to make eight, to make 16. Finally, when it gets to be a million cells, it is only a pinhead in size. Even that cannot be detected. When it is a billion cells, it is a third of an inch, and that's about the size that we usually diagnose a cancer. But all of these mutations occur silently inside a tiny spot of the body that nobody can see, and there is no way we can tell. Let's say there are ten mutations in a row and there are three or four different sources of radiation or, for that matter, some other toxic influence. Let's say there is a gene that someone inherited that may make what we call a hit. A hit is a point of damage that may cause a mutation to that chromosome. We can't tell which one caused which mutation. There is no science which enables us to look at a chromosome. It is logically impossible, because you don't—you can't find that cell to study it until it becomes a cancer.[41]

Given this reality, the linear no-threshold model, the stochastic model, and the fact of exposure, standing alone, are insufficient bases for Dr. Dollinger's conclusion regarding causation. Rather, Dr. Dollinger must present evidence tending to show that the ionizing radiation from the uranium ore dispersed as a result of Defendants' activities was, more likely than not, a but-for cause of a particular Plaintiff's

cancer. Dr. Dollinger's backward-looking, false-cause reasoning cannot support such a specific causation opinion.

Rather, a gap exists between Dr. Dollinger's premises that any dose has the potential to cause cancer (the linear no-threshold model) and that the cancer is independent of the dose (the stochastic model) and his causation conclusion. Though the severity of cancer, once it exists, is independent of dose, the *risk* of cancer development is dose-dependent, a fact that Dr. Dollinger recognizes. Thus, if a person develops cancer, then a high-dose radiation exposure would carry a higher risk, and there would be a greater likelihood that a high dose contributed to a person's cancer than a low dose. With all due respect to Dr. Dollinger, if a person who smokes has a 30% chance of developing lung cancer, the fact that that person did develop cancer does not change that risk to 100%, and it cannot be said, based on the existence of cancer alone, that the lung cancer was caused by the smoking. All that can be said is that smoking may have been a cause, and other evidence is needed to determine whether, more likely than not, it actually was. Similarly, exposure to ionizing radiation has the potential to cause cancer, or, in other words, is a risk factor for cancer, but the fact that one develops cancer after exposure to ionizing radiation does not, without more, establish that the radiation exposure was a cause of the cancer. Dr. Dollinger repeatedly testified that dose did not matter, and that any exposure above background (apparently no matter how small[42] or remote[43]) was a

---

**41.** Daubert hearing at 279–80. He further testified:

Q. And is it actually possible to separate out the contribution of each source at the level of the nucleus?

A. Thank you for adding that, because we can certainly identify the sources, but we can't say what the contribution of each source was in terms of that mutation. Mutation is hidden. No one sees it.

*Daubert* hearing at 284.

**42.** Dr. Dollinger testified that even 1 mrem above background would be a substantial contributing factor.

**43.** When he was asked by counsel if one cigarette smoked by him at age 16 could cause cancer, Dr. Dollinger testified, "[T]hat one cigarette may have contained Polonium 210

substantial contributing factor, despite acknowledging that the lower the dose, the lower the risk. In the case of a plaintiff with lung cancer who was exposed to 1 mrem of radiation above background (which Dr. Dollinger testified would be a substantial contributing factor) and who also smoked heavily, *Daubert* and *Havner* would require more of an expert witness than simply saying that the 1 mrem of radiation was a substantial contributing factor because most smokers do not get lung cancer, given that we are all exposed to radiation daily, yet most people do not get cancer.

A basic assumption of Dr. Dollinger's reports is that the Plaintiffs were exposed to ionizing radiation above background levels due to the uranium contamination, but other than that aspect of dose, the magnitude of the dose does not factor into his methodology. The Fifth Circuit has repeatedly recognized that "[s]cientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiffs' burden in a toxic tort case." *Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661, 670 (5th Cir.1999) (quoting *Allen*, 102 F.3d at 199). Further, if an expert's "causation opinion was not based on sufficient information of the level of [the agent] to which Plaintiffs were exposed, his methodology would not be reliable, rendering his causation opinion inadmissible." *Curtis*, 174 F.3d at 671; *see also Moore v. Ashland Chem.*, 151 F.3d 269, 278 n. 10 (5th Cir.1998) ("Given the paucity of facts Dr. Jenkins had available about the level of

Moore's exposure to the Toluene solution, his causation opinion would have been suspect even if he had scientific support for the position that the Toluene solution could cause RADS in a worker exposed to some minor level of the solution.").

The law does not require Plaintiffs to show the precise level of radiation to which they were exposed. *Curtis*, 174 F.3d at 671. And, of course, Plaintiffs would argue that they have shown that the Plaintiffs were exposed to a harmful level of radiation because any dose is capable of causing cancer and is therefore harmful (under the linear no-threshold model). However, Dr. Dollinger acknowledges that the risk of cancer increases as the radiation dose increases, and thus dose must play a role in determining the probability that the radiation played a causal role in the development of an individual's cancer. Nevertheless, Dr. Dollinger repeatedly stated that dose did not matter, so long as it was reasonably clear that there was some exposure above background, even if it were only 1 mrem.

In *Moore v. Ashland Chemical*, 151 F.3d 269 (5th Cir.1998), the plaintiff's causation expert had no information regarding the necessary level of exposure required to cause specific injuries and had no reliable evidence of the dose to which the plaintiff was exposed, and he failed to offer any scientific support for his general theory that exposure to Toluene solution at any level would cause RADS. *Id.* at 278. In this case, in contrast, Dr. Dollinger relies on the linear no-threshold model to support his conclusion. Although Dr. Dolling-

which I think it did because that's what's in cigarette smoke, and that Polonium 210 radiation may have been the radiation that made a mutation in one of the lung cells. Assuming you got lung cancer—I hope to God that does not happen, but assuming it could have, that would be the result of a single moment in time when a mutation—and whatever cigarette you were smoking at that moment that introduced either the Polonium or the benzpyrene or whatever other carcinogen, at that moment the cancer mutation occurred, and it was that cigarette that caused the mutation even though you may have smoked many or not so many cigarettes." Dollinger 2002 Deposition at 333–34.

er claims that the model has been validated, it appears to the Court that, in reality, some evidence tends to support the model, but it is still somewhat debatable, given the limits on experimentation and the capability of epidemiological studies to detect effects at low radiation levels.

Several courts have considered and rejected the use of the linear no-threshold model in the litigation context. *See, e.g., Wills v. Amerada Hess Corp.*, 2002 WL 140542 (S.D.N.Y.2002), *aff'd*, 379 F.3d 32 (2d Cir.2004) ("Plaintiff's expert is using a controversial theory that some toxins do not follow the dose-response relationship, but that any amount of exposure causes cancer. Even though benzene and PAHs have been shown to cause some types of cancer, it is too difficult a leap to allow testimony that says any amount of exposure to these toxins caused squamous cell carcinoma of the head and neck in the Decedent."); *Sutera v. Perrier Group of Am.*, 986 F.Supp. 655, 666 (D.Mass.1997) ("[A]lthough there is evidence that one camp of scientists ... believes that a non-linear model is an appropriate basis for predicting the risks of low-level exposures to benzene, there is no scientific evidence that the linear no-safe threshold analysis is an acceptable scientific technique used by experts in determining causation in an individual instance."); *Whiting v. Boston Edison Co.*, 891 F.Supp. 12, 24 (D.Mass. 1995) (criticizing the linear no-threshold hypothesis because it has no known or potential rate of error and cannot be falsified or validated); *Johnston v. United States*, 597 F.Supp. 374, 393 (D.Kan.1984) (noting that the linear no-threshold hypothesis is an assumption and that regulators use this model because it is more prudent to overestimate risk than to underestimate it and "just because scientists use hypotheses to describe something they really don't know for sure does not justify a court of law in using speculative hypotheses to determine that one person

has caused harm to another"); *see also* BEIR VI (the committee noted that existing biologic evidence suggests that any exposure, even very low, to radon might pose some risk, but a threshold exposure (a level of exposure below which there is no effect of radon) cannot be excluded; the committee selected a linear no-threshold relation between lung-cancer risk and radon exposure, but acknowledged that other relationships could not be excluded with complete confidence, particularly at the lowest levels of exposures).

Although the Third Circuit has apparently recognized the validity of the linear no-threshold model, it nevertheless noted that medical evaluation (documenting the fact of exposure), standing alone, is insufficient to establish specific causation:

> Although there is scientific consensus that ionizing radiation can cause cancer, ionizing radiation is not currently known to leave a tell-tale marker in those cells which subsequently become malignant. Medical examinations and laboratory tests can determine the type and extent of a cancer, suggest an optimal treatment, and provide a likely prognosis, but they rarely (if ever) provide definite information as to its cause. Consequently, medical evaluation, by itself, can neither prove nor disprove that a specific malignancy was caused by a specific radiation exposure. Therefore, *the primary basis to link specific cancers with specific radiation exposures is data that has been collected regarding the increased frequency of malignancies following exposure to ionizing radiation.* In other words, causation can only be established (if at all) from epidemiological studies of populations exposed to ionizing radiation.

*In re TMI*, 193 F.3d at 643 (emphasis added). The court further noted that "the task of establishing causation is greatly

complicated by the reality that a given percentage of a defined population will contract cancer even absent any exposure to ionizing radiation" and that radiation is a "constituent element" of our environment, and mankind has been exposed to it since our first appearance on this planet. *Id.* at 643–44.[44] Thus, even considering the linear no-threshold model, more is needed to establish the more-likely-than-not burden of specific causation.

Moreover, Dr. Dollinger's methodology for ruling in the radiation exposure in relation to each of the Plaintiff's cancers is not reliable. It became apparent to the Court from reading Dr. Dollinger's deposition that, rather than truly evaluating the studies that he listed as supporting his conclusions, Dr. Dollinger simply sifted through the literature to pick and choose positive relative risks between ionizing radiation (of any type, source, and dose) and a particular Plaintiff's cancer. Dr. Dollinger testified that he performed his own literature search and the products of the search are the articles listed in his first report. Dollinger 2003 Deposition at 495.[45] He stated that his "effort was to correlate any reports of cancer that had been found in relation to ionizing radiation exposure." *Id.* at 507.

Dr. Dollinger was specifically questioned about his citation to a study by Darby to demonstrate a link between ionizing radiation and bladder cancer. The study found an elevated risk for bladder cancer but a decreased incidence of breast cancer.

When questioned as to why Dr. Dollinger listed the study as support for his conclusions regarding bladder cancer but failed to list it in connection with breast cancer, he answered "I am not sure if it would make sense or not [to include the results for breast cancer] because we are looking for information that shows some relationship, because not all studies show a relationship." *Id.* at 559. When he was further questioned, "Don't you want to tell the court and the parties the whole picture, Dr. Dollinger. You want a report that studies what they are, whether they show an association or they don't show an association; correct? Isn't that the way scientists would do it?" he replied, "No, because I am not able to analyze the epidemiological reasoning and significance of the entire set of cancers here. There is a dozen or two dozen different cancers listed and that is—my field is not to look at the long list of cancers in each and every paper to determine what their epidemiologic significance is." *Id.* at 560. When asked if he was suggesting that "it was appropriate to pluck out one standardized mortality ratio from a paper like this Darby paper and claim that ·it supports an association between exposure to X-rays and ionizing radiation and bladder cancer, but to not look at data in the paper regarding other cancers that were studied," he replied "No. I am simply not able to analyze the complete set of epidemiologic data with respect to the lack of evidence for an association. The evidence for an associa-

44. The court noted that "[u]ranium is found in various quantities in most rocks and soils, and it is the main source of radiation exposure to people out-of-doors." *In re TMI,* 193 F.3d at 645 n. 54. Since uranium isotopes are generally present in low concentrations, they do not contribute significantly to the internal alpha dose delivered to humans. *Id.* However, since these isotopes are found in soil and fertilizers, they migrate into our food chain, and therefore, into our tissue. *Id.*

45. In his second report, Dr. Dollinger included numerous additional references and an appendix that listed studies and their findings relative to each of the Plaintiffs' cancers. However, it appears that another individual, a toxicologist named Stephen King, prepared the appendix and the list of additional references. Dr. Dollinger admitted that he did not have a chance to review every study included in the appendix or to completely verify its accuracy before submitting his second report.

tion was significant in terms of the SMRs and so on and I am not able to analyze what the reason for the lack of association may be." *Id.* at 561. He stated that he was unable to analyze the studies in this regard because he is not an epidemiologist. *Id.*

Later in the deposition, the following exchange took place:

Q. Isn't if fair to say as to bone cancer, Dr. Dollinger, what you did was instead of looking at the entire page of data, the bulk of which shows no elevation of risk, you selected out the one statistically significant elevated risk of bone cancer on this entire page of numbers to include in your report, but did not include the relative risks that were not statistically elevated; correct?

A. Yes.

Q. And this is not valid scientific methodology; correct?

A. No. I can't answer your question because that's a question an epidemiologist would be better prepared to answer. There are many factors about each of these locations and plants which may be different which may not even be contained in the report, so I would let an epidemiologist respond to that kind of question.[46]

Also enlightening was an exchange that took place regarding a 1984 study of radium dial painters and breast cancer by Stebbings that was cited in Dr. Dollinger's appendix. The authors of the study concluded, "But we believe the observations above cast severe doubt on any proposed etiologic relationship of breast cancer to ingested radium." Dr. Dollinger was questioned as follows:

Q. And in spite of the authors saying in writing in a peer-review journal that the observations in their study casts

[sic] severe doubt on any proposed etiologic relationship between breast cancer and what they are studying, that is, ingested radium, you cite this paper in Appendix D for the proposition that ingested or that radium or that ionizing radiation causes breast cancer; correct?

A. Correct.

Q. So you are ignoring the conclusions and comments of the authors as you pick out selective risks to include in Appendix D; correct?

A. I believe the word would be emphasizing certain conclusions.[47]

This failure to consider both positive and negative associations in the literature is not reliable methodology, nor does it comply with the Texas Supreme Court's admonishments that positive associations in an epidemiological study cannot support a causation conclusion until other factors, such as the Bradford–Hill factors, are considered. Though Dr. Dollinger stated vaguely that he used some of the factors in his analysis, this is not apparent from his reports and seems contradicted by his failure to fully consider the epidemiological evidence.

Dr. Dollinger appears willing to base a causation conclusion on any study that demonstrates an association between any type of ionizing radiation and a particular cancer, yet disregards the available epidemiological evidence specific to uranium that fails to support a causal link. For example, he cited the 1994 UNSCEAR Report, Sources and Effects of Ionizing Radiation, as support for his conclusions. However, that paper recognized that although uranium miners and millers working above ground may be exposed to alpha, beta, and gamma radiation from uranium compounds and progeny, "[n]o hazards

---

**46.** Dollinger 2003 Deposition at 607–08.

**47.** Dollinger 2003 Deposition at 635–36.

specific to uranium were identified in the cohort studies, apart from a suggestion in the study of workers employed at a uranium processing plant in Tennessee during the Second World War that men first exposed to uranium dust at the age of 45 years or older might be at increased risk of developing lung cancer." UNSCEAR Report at 72. It also noted that "[u]ranium millers are also exposed to airborne dust containing $^{234}U$, $^{238}U$ and $^{230}Th$" and that two studies observed a "less than expected" number of deaths from lung cancer and neither study reported an excess of bone cancer. *Id.* (also noting that the studies reported an excess of cancers of lymphocytic and haemotopoietic tissue other than leukaemia). In the conclusion section, the report notes that studies of men occupationally exposed to uranium suggest that these exposures may be associated with increased risks of specific types of cancers, "but the studies are small in size and at present have only a limited length of follow-up" such that "[f]urther information is necessary before definite conclusions can be drawn." *Id.* at 74.

In addition, the IARC Monographs on the Evaluation of Carcinogenic Risks to Humans 2001 publication "Ionizing Radiation, Part 2: Some Internally Deposited Radionuclides" contains a "Summary of Final Evaluations" that notes that the degree of evidence of carcinogenicity of uranium and its decay products, inhalation of ore dust containing uranium–234, uranium 2–35 and uranium–238 is "limited" in animals and "inadequate" in humans. IARC at 481.[48] Thus, the Court finds it unreasonable to rely on more general statements in the paper that "internalized radionuclides that emit alpha particles and beta particles are carcinogenic to humans" to support a conclusion that natural uranium exposure caused cancer in these Plaintiffs.

The Royal Society, which sought to study the health effects of depleted uranium (which is about 40% less radioactive that natural uranium), looked to epidemiological data concerning occupational exposure to uranium. The Society noted that "[t]he health of workers who are occupationally exposed to uranium has been studied extensively. These are mainly uranium miners and workers in the nuclear industry. Studies of uranium miners have identified an increased risk of lung cancer. However, these excess lung cancers are attributed to the inhalation of radon gas that accumulates within underground uranium mines. Radon–222 is a decay product of Uranium–238; radon and its short-lived decay products form a sequence of highly radioactive alpha-emitters.... Workers in the nuclear industry have however been engaged in the extraction, milling and machining of uranium, in the absence of appreciable exposure to radon over a 50 year period, and the study of their health should shed some light on the long-term effects of such exposure." However, "[s]tudies of the health of workers in the uranium industry therefore show no sign of excess deaths due to cancer or kidney disease related to inhaling or ingesting uranium. It should be stressed that epidemiological studies of this kind are not very sensitive at detecting small increases in risk. However, it is likely that a doubling in the lifetime risk of a fatal cancer would be detected by this approach." *Id.* at 18. It would be reasonable to conclude that effects not observed in uranium workers would not be expected to be seen in members of the general population who are exposed to similar or

---

48. In the evaluation section, it also states "There is *inadequate* evidence in humans for the carcinogenicity of natural uranium" and "There is *limited* evidence in experimental animals for the carcinogenicity of natural uranium." IARC, 2001 at 478.

lesser levels of uranium. *See, e.g.,* BEIR VI ("In regard to cancers other than lung cancer, the committee interpreted the pooled analysis reported by Darby and colleagues as not indicating excess risk for cancers other than cancer of the lung in radon-exposed miners. Although 95% confidence limits are wide for some sites, the data provide evidence that radon and its progeny are not a major cause of nonlung cancers and leukemias in the general population, as suggested by some ecologic studies. The committee concluded that the findings in the miners could be reasonably extended to the general population; there is no basis for considering that effects would be observed in the range of typical exposures of the general population that would not be observed in the underground miners exposed at generally much higher levels."). Yet, Dr. Dollinger fails to adequately distinguish these studies and instead relies on any positive association between any source of ionizing radiation and cancer. This is not reliable scientific methodology.

Moreover, Dr. Dollinger relied on studies with different doses and types of radiation (pure gamma as opposed to mixed alpha, beta, and gamma), different exposure pathways, and different dose rates, but made no attempt to compare the individual Plaintiffs with the study participants. Some of the studies he cites involved external gamma radiation, whereas this case deals primarily with internal exposures to uranium, which is primarily an alpha-emitter. In addition, many of the studies involve significantly higher doses and different dose rates (instantaneous versus prolonged). Dr. Dollinger fails to bridge the gap between the epidemiological evidence that he cites and his conclusion that a particular Plaintiff's cancer was caused by his or her exposure to ionizing radiation from the uranium ore. Thus, even considering the non-uranium ionizing radiation epidemiological studies that Dr. Dollinger cites as support for his conclusions, his failure to link the Plaintiffs to the study subjects on any basis, including dose and dose rate, which are significant in determining biological effects of radiation and which he acknowledges affect risk, renders his specific causation opinion unreliable.

Dr. Dollinger's testimony is similar to the testimony of Dr. Espinoza excluded in *Kelley v. American Heyer–Schulte Corp.,* 957 F.Supp. 873 (W.D.Tex.1997). There, Dr. Espinoza was offered to testify that the Plaintiff's breast implants caused her Sjogren's Syndrome. The Plaintiff possessed anomalous antibody levels in her blood chemistry, which led Dr. Espinoza, based upon his observations with other women, to conclude that the Plaintiff's condition was implant-related. He admitted, however, that if the Plaintiff did not have implants but had the exact same symptoms and blood chemistry, his diagnosis would have been non-implant-caused Sjogren's Syndrome. The court offered an illustration: "Assume that Dr. Espinoza saw a set of 100,000 women without breast implants, 10,000 of whom possess symptoms and blood chemistry identical to the Plaintiff. Faced with these symptoms, Dr. Espinoza would diagnose all 10,000 of them with non-implant Sjogren's syndrome. Further, assume that Dr. Espinoza saw a set of 100,000 virtually identical women with breast implants, 16,000 of whom suffered from symptoms identical to that of the Plaintiff. Dr. Espinoza would diagnose all 16,000 as having implant-related Sjogren's Syndrome." *Id.* at 882. Although in *Kelley* there was no epidemiological evidence linking implants to Sjogren's Syndrome, whereas here there is epidemiological evidence in general to link ionizing radiation, the underlying criticism of such faulty reasoning applies equally to this case. Because cancer occurs naturally and it is impossible to directly determine the exact cause or causes of an individual's cancer, it

is not enough to conclude causation under a more-likely-than-not standard simply from the fact of exposure, even accepting the linear no-threshold model. Plaintiffs must proffer reliable scientific evidence that, more likely than not, that exposure was a substantial factor in bringing about the cancer. Because Dr. Dollinger's proffered testimony in general is not reliable, it must be excluded.

*Hereditary Effects (the 4 child plaintiffs)*

■ Dr. Dollinger's proffered opinion regarding cancer causation in the four children plaintiffs further supports the Court's decision to exclude his testimony as unreliable. Dr. Dollinger proposes to testify that CarylAnn Hernandez's osteogenic sarcoma of her leg (at the age of 10) was caused by ionizing radiation exposure to her and her parents; that Crystal Yanta's leukemia (at the age of 14) was caused by her exposure as well as her father's; that Jose Hernandez IV's brain tumor (at the age of 4) was caused by his mother's exposure; and that Thomas Molina's leukemia was caused by his father's exposure.

The Third Circuit, in *In re TMI*, 193 F.3d at 642, recognized that one generally recognized type of stochastic event is one that can occur in cells of the germinal tissue and may result in hereditary disorders in the descendants of the irradiated. The court qualified its statement by noting "[h]owever, even though hereditary stochastic effects have been demonstrated on highly irradiated mice, hereditary stochastic effects have not yet been clearly demonstrated in humans. Thus, any such effects are based on extrapolation from mice to humans.[49] Genetic studies of the almost 15,000 children of the survivors of the atomic bombing in Japan have not yielded evidence of a statistically significant increase in severe hereditary effects." *Id.*

In support of his conclusions, Dr. Dollinger cited a number of references without specifically incorporating the majority of them into his analysis or explaining how and why he relied on any particular reference. There are several references cited that deal with hereditary effects. One cited study is Morris, J.A., *Childhood Cancer Around Nuclear Installations,* Eur. J. Cancer Prev. 3, 15–21 (1994), in which the authors noted that "[f]or sites other than Sellafield in the UK, the evidence linking childhood cancer to radiation is unconvincing and it is possible that the increase is entirely due to the social characteristics of the communities" and "[i]n spite of a great deal of epidemiological investigation, no clear answer is available." The author discussed the 1990 Gardner case-control study, which found that the risk of leukaemia was related to the preconceptual level of radiation exposure to men working in the plant and proposed that radiation led to a mutation in spermatozoa that predisposed to leukaemia in their offspring. The author noted "several problems" with that explanation, including (1) the result depends on a small number of cases whose fathers were employed in the plant, and similar case-control studies conducted around Dounreay and in Canada have failed to confirm the finding; (2) the explanation is contrary to conventional views in radiobiology; (3) there was no increase in childhood leukaemia in the offspring of men irradiated following the nuclear bombings in Japan, even though they were exposed to higher levels of radiation than the Sellafield workers; (4) new germ line mutations arising in spermatozoa occur with an average frequency of around one per 100,000 live births and the increased incidence of leukaemia in Seascale would

---

49. The court further noted that "[s]uch extrapolation has led to the estimate that at least 1 Gy or 100 rad of low-dose, low LET radiation is necessary to have any hereditary stochastic effect on humans." *Id.* at 642 n. 49 (citing BEIR V at 4).

imply a 500–fold increase in spermatozoa mutant frequency, which would be likely to cause infertility and, if not, would lead to a greatly increased incidence of birth anomalies, which has not been recorded. The author further noted that "[t]here is experimental evidence that irradiation of paternal mice can lead to a raised incidence of tumours in their progeny, but the level of radiation used was much higher than experienced at Sellafield." [50]

Dr. Dollinger also cites a 1999 study by Roman et al. entitled "Cancer in children of nuclear industry employees: report on children aged under 25 years from nuclear industry family study." Though there is an "impressive" finding that "[t]he leukaemia rate in children whose fathers had accumulated a preconceptual does of ≥ 100 mSv was 5.8 times that in children conceived before their fathers' employment in the nuclear industry," the authors note that this was based on only three exposed cases. Further, the authors noted that "[t]he overall incidence of cancer and leukaemia among children of nuclear workers was similar to that in the general population. The estimated risk of leukaemia in children whose fathers were monitored for exposure to radiation at work before their

child's conception was about twice that of children conceived before their fathers joined the workforces under study. Though this excess was not significant overall, significant findings were apparent for the small group of children whose fathers were exposed to relatively high doses of radiation before their conception." In addition, "[i]f there is an occupational effect associated with paternal exposure to relatively high doses of radiation, the number of leukaemias that could be attributed to such an exposure in our study is small— such exposure could account for at most three of the 22 leukaemias diagnosed in almost 40000 reported children born during the 60 years 1937–96."

At his deposition, Dr. Dollinger was questioned about his conclusion that Thomas Molina's leukemia was caused by his father's exposure to ionizing radiation. He was asked "what studies can you cite to me that would establish in some study that a child such as Thomas ... would contract leukemia as a result of his father receiving a dose in the range that is identified here by Dr. Resnikoff?" He answered, "Up until the very last part of your question, I was about to mention the Sellafield studies in the United Kingdom,[51] where childhood

50. Dr. Dollinger also cites some studies relating to *in utero* exposure, but the Court does not read his opinions as being based on such exposure. However, although the study of leukaemia incidence in Greece following the Chernobyl incident indicated an increased relative risk (2.6) (Petridou et al., *Infant Leukaemia after in utero exposure to radiation from Chernobyl* (1996)), the findings of that study were called into question by another letter cited by Dr. Dollinger entitled "Infant Leukaemia after the Chernobyl accident." The authors noted that an increase in infant leukaemia was observed in western Germany in children born after the Chernobyl accident, but conclude "that the observed effect was not due to ionizing radiation from the Chernobyl accident." The authors noted an increase in leukaemia that was highest in the regions with the lowest contamination by radioactive fallout, and thus concluded that the observed increase in infant leukaemia "is not caused by an increased *in utero* exposure to ionizing radiation from the Chernobyl accident." Moreover, the authors of the Greek study noted that "low-level preconceptual radiation has no demonstrable effect on leukaemia risk."

51. The Court assumes that this reference is to studies such as the 2002 study "Leukaemia and Non–Hodgkin's Lymphoma in Children of Male Sellafield Radiation Workers" by Dickinson and Parker. That cohort study's objective was to investigate if there was an excess risk of leukaemia/non-Hodgkin's lymphoma among children of male radiation workers at the Sellafield nuclear installation, whether there was a dose-response relationship between fathers' preconceptual irradia-

leukemia is related to the father's exposure to radiation. I don't recall at this time in those studies the specific dosages which may have been given." Dollinger 2002 Deposition at 206.

When questioned about Jose Hernandez IV's brain tumor, he stated "[m]y understanding is that the mother was exposed to ionizing radiation as a result of the actions of the defendants, and that some genetic malformation occurred in the germ cells which showed that this malformation resulted in a brain tumor in her child." Dollinger 2002 Deposition at 211. Dr. Dollinger admitted that he could cite no study that found that there was an increase in brain tumors in the offspring of persons who were exposed to ionizing radiation. Id. at 216–17. However, he based his conclusion on "the general concept of changes in germ cells from radiation, which is well known to occur, and the Sellafield is such an example of changes in germ cells from radiation." Id. at 216.

Dr. Dollinger was also questioned about his conclusion regarding CarylAnn Hernandez's osteosarcoma (bone cancer):

Q. And isn't it correct that the contention is that as the daughter of Helen and David, she somehow received some sort of genetic propensity to develop cancer?

A. That's correct.

Q. And you don't believe that to be true from a science perspective; correct?

A. I am not sure what the source of the ionizing radiation was, whether it was her own exposure or whether there was some effect on the eggs or sperm causing her egg to be genetically altered or both. Obviously I don't know the molecular events that had occurred or at what time they occurred, whether it was before the egg was fertilized or after or after she was born, and it was a direct effect on an area of bone in her body without being affected by the parents'

---

tion and their children's risk of leukaemia/non-Hodgkin's lymphoma, and whether any observed association could be explained by demographic factors. The study found that "[c]hildren of radiation workers had a higher risk of leukaemia/non-Hodgkin's lymphoma than other children [rate ratio (RR) = 1.9, 95% confidence interval (CI) 1.0–3.1, p =0.05]." Further, "[t]he risk increased significantly with father's total preconceptual external radiation dose." In their conclusions, the authors stated that "[c]hildren of radiation workers had a 2–fold increased risk of leukaemia/non-Hodgkin's lymphoma compared to other Cumbria-born children, partly due to high levels of population mixing among Seascale radiation workers.... Although a substantial proportion of cases of leukaemia/non-Hodgkin's lymphoma among children of radiation workers are probably due to population mixing, some may be due to ppi and we cannot exclude the possibility of such an effect outside Seascale." Of particular interest, the study evaluated the risk from both external and internal ionizing radiation exposure, and specifically analyzed workers monitored for exposure to internal plutonium, fission

products, and natural uranium. "Children whose fathers were monitored for natural uranium before conception had an increased risk of leukaemia/non-Hodgkin's lymphoma compared to other children of radiation workers." The study showed a relative risk of 3.8% with a 95% confidence interval of .8—12.4 and p=.08. The authors noted that the effect was partly confounded with external dose: fathers monitored for natural uranium tended to have much higher external ppi doses than other radiation workers. After adjusting for external ppi, an almost 3–fold risk remained (adjusted RR=2.9, 95% CI .6–9.8, p=.15). (The Court notes that these findings would not be considered statistically significant.)

The authors concluded "[c]hildren whose fathers were monitored for exposure to natural uranium were at increased risk of leukaemia/non-Hodgkin's lymphoma. No other study has considered internal exposure to natural uranium in this context. Further studies are needed to investigate whether our finding is due to confounding of exposure to external radiation and internal uranium or to chance rather than a real effect."

exposure. I cannot know which of these is the valid or if, in fact, all of them are valid or could be valid.

Q. You would agree with me that none of the scientific or medical data in the peer-review literature which you have cited in your report supports a conclusion that exposure to the parent of ionizing radiation from uranium or the by-products of uranium cause the offspring of those parents to develop any particular kind of cancer?

A. With the exception of the Sellafield study which we already discussed in my previous deposition which was the subject to great discussion and reversal of opinion on several occasions and having to do with leukemia, which is not considered here. The answer, in connection with this type of bone tumor, to your question is yes.

Q. So you don't have any scientific data to support a claim that CarylAnn Hernandez's osteosarcoma was caused by the exposure to her parents?

A. Correct.[52]

At the *Daubert* hearing, the following exchange took place:

Q. And you will agree that no data in the peer-reviewed literature supports a conclusion that exposure to ionizing radiation from uranium or its decay products causes cancer in their children, correct?

A. I would not agree with that. Now, it may have been the case a couple of years ago when my deposition was taken. There is subsequent literature indicating there is a relationship.

Q. Well, sir, you agree that that is what you said in your deposition, correct?

A. That is correct.[53]

. . . .

Q. And you said at your deposition, sir, that you had no scientific data that would support the claim that a particular plaintiff, CarylAnn Hernandez's osteosarcoma was caused by the exposure to her parents, correct?

A. That is correct. At that time, I had no information about that specific answer, in that context.[54]

Dr. Dollinger's willingness to reach a conclusion without supporting scientific evidence certainly undermines the reliability of his conclusions. Moreover, the data that he did have, namely the Sellafield studies, did not directly support his conclusions because he did not provide sufficient evidence to justify extrapolating from that study to each of the particular Plaintiffs, especially in the case of exposure to a mother, which was not at issue in the Sellafield study, and in the case of bone cancer, which was not examined in the Sellafield study. Even if one could take the leap of faith that Dr. Dollinger has, his conclusions are inconsistent with his statements regarding CarylAnn Hernandez. Despite the fact that he admitted that he cannot know whether CarylAnn Hernandez's cancer was caused by her own exposure, that of her parents, or both, Dr. Dollinger stated in his report that her cancer was caused by all of those exposures. Dr. Dollinger provides no scientifically reliable evidence to justify his conclusion that exposures to CarylAnn, her father, and her mother all played a "significant" part in her cancer development.

*Dr. Dollinger's Daubert testimony/methodology*

Defendants have filed post-hearing briefing criticizing Dr. Dollinger's new

---

**52.** Dollinger 2003 Deposition at 589–91.

**53.** *Daubert* hearing at 373.

**54.** *Daubert* hearing at 375.

conclusions raised at the *Daubert* hearing regarding whether the radiation exposure was a predominant cause of a particular Plaintiff's background.

Dr. Dollinger's method consisted of taking the average organ dose from the range estimated by Dr. Resnikoff and comparing it to the annual background radiation dose of 250 mrem. The Court notes that use of the average number in the range is questionable. Although Dr. Dollinger testified that he believed this number to be least likely to be wrong, in reality, the average is just as likely to be wrong as the low end of the range. Use of the average simply means that, if the number is wrong, the potential magnitude of the error is less than if one chose the lowest number in the range.[55] Thus, while the Court commends Dr. Dollinger's attempt to minimize any potential error in determining the number, the Court concludes that, for litigation purposes, it would have been more prudent to select the low number in the range. This is because, accepting Dr. Resnikoff's dose estimates as correct, one knows that the radiation dose is at least the lowest number in the range, and thus conclusions based on the use of that number are not speculative. However, the farther you get from the low number, which you know must be true in the sense that it must be at least that, the more speculative the opinion becomes.

That aside, the Court concludes that Dr. Dollinger's methodology has another, more serious flaw, as pointed out by the Defendants. Dr. Dollinger agreed that the background radiation number of 250 mrem is a yearly dose, yet he compared that number to Dr. Resnikoff's cumulative organ doses over several decades. Thus, as Defendants argue, "Even under his own arbitrary methodology, Dr. Dollinger is comparing apples to oranges. For example, an individual living in Karnes County for 10 years would have a cumulative background dose of 2,500 millirems, over twice Dr. Dollinger's arbitrary 1,000 millirems standard."

Moreover, Dr. Dollinger's new methodology has not been published or subjected to peer-review, nor does it appear to be a generally accepted methodology in the scientific community. Further, it has not been tested and Dr. Dollinger did not testify regarding any known rate of error.

Accordingly, the Court concludes that any opinions rendered based on this flawed new methodology are unreliable and should be excluded.

### Conclusion

"The law cannot wait for future scientific investigation and research. We must resolve cases in our courts on the basis of scientific knowledge that is currently available. The inquiry authorized by Rule 702 is a flexible one; however, a scientific opinion, to have evidentiary relevance and reliability, must be based on scientifically valid principles." *Moore*, 151 F.3d at 276. A district judge asked to admit scientific evidence "must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Id.* at 278 (quoting *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316 (7th Cir.1996)). Although Dr. Dollinger is well credentialed and is undoubtedly an excellent clinical practitioner, the Court concludes that his testimony does not satisfy the reliability criteria set forth in *Daubert* and the Rules of Evidence. Accord-

---

**55.** For example, if the range given was 100 to 200 but the "true" number was 185, both 100 and 150 are wrong and are equally likely to be wrong, but the 100 number is "more wrong" than the 150 number. The potential magnitude of the error is greater when using the low end of the range, since the average could only be wrong by 50, whereas the low number has the potential to be wrong by up to 100.

ingly, the Court GRANTS Defendants' motion to exclude his testimony (docket no. 196) and renders summary judgment in favor of Defendants. This case is therefore DISMISSED WITH PREJUDICE. All other pending motions are DISMISSED AS MOOT. Defendants may file a bill of costs in the form required by the Clerk of this Court within 30 days of the judgment.